## In re GULPH WOODS CORPORATION, Debtor.

### Bankruptcy No. 87–03093S.

United States Bankruptcy Court, E.D. Pennsylvania.

March 11, 1988.

Pace Reich, Philadelphia, Pa., for debtor.

Thomas D. Rees, Norristown, Pa., for Lower Merion Sewer Authority.

Leonard P. Goldberger, Philadelphia, Pa., Kenneth S. Goodkind, Woodbridge, N.J., for Nassau Sav. and Loan Ass'n.

### MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

Presently at issue in this seemingly interminable test of wills between the principal of the Debtor, John S. Trinsey, Jr. (hereinafter referred to as "Trinsey"), and Nassau Savings and Loan Association (hereinafter referred to as "Nassau") is a "Cross–Motion for Injunctive and Declaratory Relief" filed by Nassau in connection with a mailing sent to all of the creditors of the Debtor by Trinsey during the period in which Nassau was soliciting votes on its Plan of Reorganization in competition with that of

---

the Debtor. Because we consider Trinsey's mode of communication in this mailing to be, in several respects, improper, we shall enter an order preventing him from making any future communications to creditors with respect to an anticipated future solicitation of an Amended Plan by Nassau without court approval. However, because we fail to find such communications improper *per se* and because we find an absence of proof that any further remedy is warranted, no further relief shall be granted to Nassau.

The underlying controversy between Trinsey and Nassau, graphically and repetitously portrayed in eight days of trial conducted between October 19, 1987, and December 3, 1987, arises from the Debtor's efforts to construct 188 townhouses and 50 condominium units on a hilltop tract of land in Upper Merion Township, Montgomery County, Pennsylvania, known as Rebel Hill. Nassau provided over $7 million in financial support for this project, but discontinued doing so because of its dissatisfaction with Trinsey's management of the project.

When an attempt to settle a foreclosure action brought by Nassau in federal district court was frustrated by Trinsey's inability to co-exist with contractors put in place by agreement of the parties to assist him in completing the project, the Debtor filed a Chapter 11 bankruptcy. This was a familiar respite for Trinsey, who filed five bankruptcies for other corporations in which he was a principal since 1972, one other case for this same debtor in 1986, and has recently filed a Chapter 11 case of his own, his second personal filing.

The subject matter of the extended trial in this matter was a consolidated hearing on Nassau's motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) and for adequate protection pursuant to § 363(e), and counter-motions by the Debtor to use cash collateral, to sell certain lots, and to engage in borrowing in order to get a projected scheme for salvaging the Rebel Hill project off the ground. A decision on these matters awaits completion of briefing by the parties targeted for March 31, 1988.

After completion of the aforesaid hearing, the Debtor, on December 9, 1987, filed its third Amended Plan of Reorganization. A Disclosure Statement was ultimately approved and voting took place thereafter. Predictably, Nassau voted against the Plan, requiring the Debtor to resort to seeking confirmation under 11 U.S.C. § 1129(b). Those efforts resulted in another extended hearing which was completed on January 29, 1988, and is also being briefed by the parties simultaneously with the other mass of motions, due to be completed on March 31, 1988.

On December 21, 1987, Nassau filed its competing Plan of Reorganization. A Disclosure Statement was approved on January 21, 1988, and ballots were to be solicited and tabulated by February 19, 1988.

On February 5, 1988, Trinsey sent the following form letter to all of the Debtor's creditors:

JOHN S. TRINSEY, JR.

169 Providence Forge Road

Royersford, Pennsylvania 19468

(215) 933–9237

[Name of Creditor]
RE: Rebel Hill
Dear [Creditor]:

Thanks for your vote in favor of my Gulph Woods Corporation Plan of Reorganization.

We are in good shape as far as the voting is concerned as more than 90% have accepted, not counting Nassau's vote.

Now we must defeat Nassau's plan to sell Rebel Hill at Bankruptcy and/or Sheriff Sales which would only pay Nassau and the rest of us would get nothing.

Enclosed please find a new ballad [sic] for rejection of Nassau's plan. Please sign and return it to me in the self-addressed envelope. If sufficient creditors vote against Nassau's plan it will show the Bankruptcy Court that the vast majority of Gulph Woods Creditors want my Plan to be given a chance to succeed and

give all legitimate creditors a chance to be paid.

I'll keep in touch with you as this thing is winding down to victory I hope and pray.

Thanks for sticking by me.

Regards,

/s/ Jack Trinsey

Enclosed with the letter was a ballot form precisely like that sent out by Nassau's counsel except that an "X" was pre-marked in the line for "Rejects." Although the ballot stated, on its face, that it was to be mailed to Nassau's counsel, Trinsey sent a stamped, self-addressed envelope in keeping with his request, in the text of the letter, to send these ballots to him.

The instant Cross–Motion was responsive to a Motion by the Debtor to compel inspection of the ballots prior to the expiration of the voting period.[1] A hearing on the Cross–Motion was conducted on March 1, 1988, at which Trinsey testified and claimed that the sole purpose for his request to examine the ballots was to know which creditors had not voted in order that he could engage in further solicitation of only those parties. Trinsey also testified that he engineered the February 5, 1988, solicitation effort entirely on his own, without discussing same with either his counsel or the Debtor's counsel. Thus, able counsel of the Debtor and Trinsey, while vigorously defending Trinsey's actions, was not implicated in them. Trinsey appeared at the March 1, 1988, hearing with the second of two independent counsel whom he has employed in the course of this case.

Nassau contends that Trinsey's actions tainted the voting process, pointing to the fact that one creditor, Northeastern Hospital, dispatched both Nassau's original ballot accepting the Plan *and* Trinsey's pre-marked form rejecting the Plan. The Code sections relied upon by Nassau in its Cross–Motion were 11 U.S.C. §§ 1125(b) and 1126(e), which provide as follows:

§ 1125

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

§ 1126

(e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

The principal secondary source relied upon was the following passage in 5 COLLIER ON BANKRUPTCY, ¶ 1125.03, at 1125–39 (15th ed. 1987):

If the opponents of the plan intend to solicit rejections of the plan simultaneously with the proponents' solicitation of acceptances, the plan opponents should obtain from the court an affirmative finding that rejections may be solicited on the basis of the information contained in the disclosure statement filed by the proponents of the plan and approved by the court.

Supporting case precedent in this Circuit was cited in the decisions in *In re Century Glove, Inc.*, 74 B.R. 952 (Bankr.D.Del. 1987), *aff'd in part and rev'd in part sub nom. First Nat'l Bank of New York v. Century Glove, Inc*, 81 B.R. 274 (D.Del. 1988); and an unreported Bench Opinion and Order of Chief Judge Twardowski of this court in *In re Spirited, Inc., Spirited, Inc. v. Davis, et al,* Bankr. No. 81–04307T, Adv. No. 82–0683T (Bankr.E.D.Pa. March 24, 1982).

---

1. The Motion itself was effectively denied on February 16, 1988, when we allowed the inspection to take place only one hour before the voting period expired on February 19, 1988. See page 343 & n. 2 *infra.*

Trinsey responded with a contention that § 1125(b) prohibited only solicitation of voting which was not previously authorized by the court *prior to* the time that a disclosure statement was approved and dispatched. Here, two disclosure statements had preceded Trinsey's communique of February 5, 1988. Citing *In re Snyder*, 51 B.R. 432 (Bankr.D.Utah 1985), for the principle that the prohibitions on communications by § 1125(b) should be interpreted very narrowly, Trinsey contended that his mailing was not strictly within the scope of § 1125(b). He further argued that his dispatch was not untruthful and was not established to have confused any creditor except Northeastern Hospital. Trinsey also pointed out that an overwhelming number of rejections of Nassau's Plan had rendered the impact of his letter and enclosures irrelevant to the outcome of the voting. Moreover, at the hearing of March 1, 1988, Nassau expressed an intention to submit and solicit an Amended Plan in any event, making the outcome of the voting on its original Plan a moot point. Finally, he contended that the relief sought by Nassau was in effect a preliminary injunction based upon 11 U.S.C. § 105(a), which is extraordinary relief confined to situations where proof of irreparable harm and a strong substantive basis for relief was presented. *See In re University Medical Center, University Medical Center v. American Sterilizer Co., et al.*, 82 B.R. 754, 757, 758 (Bankr.E.D.Pa.1988).

■ If the position of Nassau is that no communications regarding a proposed plan may emanate from interested parties to creditors during the plan voting period which have not been approved by the court, we cannot concur. Such a rule would most probably clash with the first amendment to the Constitution. Indirect communications, arising from pleadings filed in the case during the voting period, *see In re Reliable Investors Corp.*, 44 B.R. 904 (Bankr.W.D. Wis.1984), could not be prohibited in any event. Oral communications among and between creditors or other interested parties should not be prohibited, since "free negotiation among parties regarding a proposed plan," *Century Glove* (district court) *supra*, 81 B.R. at 280, is a desideratum. Nor could enforcement of such communications be effectively policed. Since all creditors here have had two very complete and court-approved disclosure statements in hand, we do not think that receipt of an additional communication would seriously confuse or mislead most creditors. We assume that creditors are wise enough to read materials at their disposal and decide how to vote on the basis of them. We do not think that it is consistent with fundamental principles of American democracy to clamp prior restraints upon communications regarding the voting process, here as in any other American election process. *Cf. Alderman v. Philadelphia Housing Authority*, 496 F.2d 164, 169–71 (3d Cir.), *cert. denied*, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974).

On the other hand, there must be some limitation on communications, lest the entire process of requiring court approval of disclosure statements be undermined. In *Snyder, supra*, the court drew the line by defining the term "solicitation" very narrowly. 51 B.R. at 436–37. We observe, however, that the communications in that case were not sent during a period of balloting on a plan, but were merely sent to encourage creditor acceptance of a forthcoming plan. Here, it is clear that Trinsey was seeking to solicit rejections of Nassau's Plan during the period for voting on that Plan.

In *Century Glove*, the bankruptcy court analyzed whether individual creditors were confused by improper and unapproved communications from a creditor. However, the District Court, reversing, followed *Snyder*, and found that the communication in issue was not actually a "solicitation" of a vote. In *Spirited*, the court found that the communications were, *inter alia*, "improper and deceptive," and hence a corrective notice was required. The factors which caused the bankruptcy courts to act appear to be those which clearly could justify such actions. If an interested party dispatched what is unmistakeably a solicitation to ac-

cept or reject a Plan, like here, to creditors during the voting period which contained falsehoods or mischaracterizations, then its dispatch would violate § 1125(b), because it would tend to unfairly influence votes. Similarly, any mode of communication which would tend to misrepresent or distort the voting process should not be tolerated.

In sum, we believe that there is a delicate balancing process between the principles of the first amendment and the purposes of § 1125(b) in which a court must engage to assess the legality of a certain communication. Results will therefore be fact-determinative. Since the consequences of an improper and deceptive communication can be the rather severe monetary sanction of paying to attempt to repair the distortion to the voting process caused by the improper communication, *see Century Glove* (bankruptcy court), *supra*, 74 B.R. at 958, it is hoped that parties desiring to make communication will opt to seek prior court approval in any doubtful cases.

■ Having established the foregoing general principles regarding unauthorized communications, we now apply them to the facts at hand. It is our belief that the dispatch of the letter sent by Trinsey not in itself an act violative of § 1125(b). However, we find that the additional dispatch of the pre-marked facsimile of the ballot and a self-addressed envelope requesting that the facsimile ballot be returned to him were improper. Sending facsimile ballots was bound to cause confusion, because creditors would not be receiving two ballots instead of one ballot in connection with the same voting process. Pre-marking the ballot was, we believe, *per se* improper. We would consider it the equivalent of a plan's proponent pre-marking a ballot with an acceptance. We have never known any plan proponent to be so presumptuous as to have not instinctively perceived the impropriety of so doing. Finally, it was grossly improper for Trinsey to request creditors to mail their ballots back to him. This

directly interfered with the court-approved method of effecting the election, i.e., by ballots to be sent to Nassau's counsel. Despite Trinsey's protestations that he sent all of the ballot received by him, unopened, directly to Nassau's counsel, we can perceive no motivation for having these ballots sent to him except to permit Trinsey to intercept them. Although it could be argued that Trinsey merely wanted to know what creditors had voted on the Plan so that he could solicit only the non-voters further, we wonder how this could be accomplished if Trinsey did not open the mailings. We also note that Trinsey vigorously prosecuted a motion to examine the ballots in Nassau's possession prior to the conclusion of voting, presumably to accomplish this same end.[2]

We also note that the parties who dispatched the disputed communication in *Century Glove* and *Spirited* were either attorneys themselves or acting on advice of counsel. Here, Trinsey acted independently from both the Debtor's counsel and his own counsel. It almost appears as if Trinsey deliberately refused to ask counsel's advice before sending off his solicitation letter, for fear of disapproval. Such reckless conduct is not praiseworthy.

What determined that Trinsey's acts of preparing facsimile ballots, pre-marking same, and directing creditors to return the ballots to him were all improper, we must determine what, if any, sanctions are appropriate. We do not agree with the conclusion of the lengthy analysis of § 105(a) contained in Trinsey's Brief that we can grant appropriate injunctive relief only if Nassau has shown irreparable harm and the other elements set forth in *University Medical Center, supra;* and *In re Monroe Well Service, Inc.,* 67 B.R. 746, 752–53 (Bankr.E.D.Pa.1986). There, the movants were seeking extraordinary relief for which the Code clearly did not ordinarily provide. Here, the movant is seeking enforcement of mandatory Code provisions which establish certain procedures for plan voting,

---

2. We effectively denied this motion only because we believed that Trinsey's communication had served the same purpose already. We most

probably would have granted it had the communication in issue not come to light.

which Trinsey violated. We believe that the 1986 amendment to § 105(a) vests in us the power to take any action necessary to enforce Code requirements *sua sponte*, without any finding of harm to any interested party arising from the Code violation. *See In re Daily Corp.*, 72 B.R. 489 (Bankr. E.D.Pa.1987) (bankruptcy court possessed innate power to enforce failure to follow Code provisions even prior to 1986 amendment to § 105(a)).

However, we do not believe that the impact of Trinsey's improprieties was in fact very substantial. Nassau has filed an Amended Plan and is attempting to obtain court approval to send a further solicitation to creditors. Not only does this new voting process technically render the voting on Nassau's previously-presented Plan moot, but this later dispatch will most probably have a corrective impact on Trinsey's communication in itself, as it will deflect attention from it. A corrective disclaimer such as was mandated by Chief Judge Twardowski as relief in the *Spirited* case would probably be counter-productive here. Creditors have already been bombarded with two lengthy disclosure statement, the Trinsey communications, and now most probably be receiving a new modified disclosure statement from Nassau.

We will, however, enjoin Trinsey from dispatching any further communications with creditors regarding the plan voting process, either orally or in writing, unless court approval is first obtained. After his previous performance in sending out the rather clearly objectionable materials in issue, we feel that such an order is appropriate. Moreover, Trinsey has already clearly expressed his position to creditors that Nassau's plan should be rejected in his communique of February 5, 1988. He is not therefore unfairly prejudiced by such a directive.

An Order consistent with the foregoing Memorandum will be entered.