In re ASPEN LIMOUSINE SERVICE, INC., doing business as Vans to Vail, Inc. and Vans to Breckenridge, Inc., a Colorado Corporation, Debtor.

COLORADO MOUNTAIN EXPRESS, INC., Appellant,

v.

ASPEN LIMOUSINE SERVICE, INC., Appellee.

Civil Action Nos. 95–K–3236, 96–K–119. Bankruptcy No. 95–14489 SBB.

United States District Court, D. Colorado.

June 17, 1996.

Glenn W. Merrick, Merrick, Calvin, Merker & Nash, LLC, Denver, CO, Thomas F. Quinn, Frederick L. Colwell, Jones & Keller, P.C., Denver, CO, for appellant.

Michael Errol Katch, Harvey Sender, Bonnie A. Bell, Katch, Sender & Wasserman, P.C., Denver, CO, for appellee, debtor.

## MEMORANDUM DECISION ON APPEAL

KANE, Senior District Judge.

Chapter 11 debtor Aspen Limousine Services, Inc. (ALS) and shuttle-service rival Colorado Mountain Express, Inc. (CME) have been engaged in legal fisticuffs for much of the past year. The reorganization proceedings out of which this latest appeal arises were the subject of a previous memorandum decision issued on March 15, 1996. *See Colorado Mountain Express, Inc. v. Aspen Limousine Serv., Inc. (In re Aspen Limousine),* 193 B.R. 325 (D.Colo.1996). As described at pages 330–31 and footnote 9 of the opinion, CME wrote a letter (the "CME Letter") to ALS's creditors promoting its competing plan of reorganization after Judge Brooks had conditionally approved a different plan offered by ALS. Judge Brooks had earlier declined to give conditional approval to CME's plan, stating his intent to allow ALS, a small business debtor proceeding under §§ 1121(e) and 1125(f), a "first opportunity" to solicit acceptances of its plan. In the March 15 memorandum decision, I expressly approved Judge Brooks's handling of the

confirmation process in this regard and affirmed the resulting Order of Confirmation.

After a hearing on December 6, 1995, Judge Brooks issued an order of contempt pursuant to Rule 9020, Fed.R.Bankr.P., finding the CME Letter an unlawful solicitation within the meaning of 11 U.S.C. § 1125(b).[1] *See* Findings of Fact and Conclusions of Law: Order of Contempt (R.Vol. I, Tab 374), filed December 20, 1995 (the "Contempt Order"). The bankruptcy court imposed sanctions in the amount of $1000 and attorney fees against CME. For the following reasons, I affirm.

## I. *STANDARD OF REVIEW*

Unsure of whether the contempt issue was a "core" or "noncore" proceeding under 28 U.S.C. § 157, CME filed two separate appeals of the Contempt Order. Civil Action No. 95–K–3236 covers the first instance, and is a direct appeal. Under *Zions First Nat'l Bank v. Christiansen Bros., Inc. (In re Davidson Lumber Sales, Inc.),* 66 F.3d 1560, 1563 (10th Cir.1995), the bankruptcy court's findings of fact would be subject to the clearly erroneous standard of review and its conclusions of law would be reviewed *de novo.* Under *Lawrence Nat'l Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 182 (10th Cir.1991), the court's ultimate decision to impose the sanction would be reviewed for an abuse of discretion. *Applied in Priddy v. Eley (In re Rossmiller),* 82 F.3d 426 (Table), 1996 WL 175369 (Text) (10th Cir.1996) (unpublished disposition). Civil Action No. 96–K–119 covers the second instance, and seeks *de novo* review of the Contempt Order under Rule 9033(d) of the Federal Rules of Bankruptcy Procedure.[2]

Confusion arises because the Tenth Circuit has sent mixed signals on which standard applies to contempt orders and has, in at least one ruling, applied both. *See Moun-*

---

1. The bankruptcy court refers to § 1125(b) as the Code section violated by CME's solicitation. Because ALS was soliciting approval of its plan as a small business debtor, § 1125(b) applies to CME's conduct as modified by § 1125(f)(2). Because confirmation proceedings with respect to small business debtors are accelerated, § 1125(f)(2) permits solicitation on debtor's plan to commence upon conditional, rather than final, approval of the debtor's disclosure statement.

2. Rule 9020, which governs contempt proceedings in bankruptcy, provides that contempt orders "shall be reviewed as provided in Rule 9033." Fed.R.Bankr.P. 9020(c). Rule 9033(d), in turn, provides for *de novo* review of a bankruptcy court's findings of fact and conclusions of law in noncore proceedings.

*tain Am. Credit Union v. Skinner (In re Skinner),* 917 F.2d 444, 450 (10th Cir.1990) (stating that contempt orders related to core proceedings are themselves core proceedings and applying clearly erroneous standard to bankruptcy court's findings of fact, but also suggesting the delegation of contempt power to the bankruptcy court is unconstitutional unless subject to *de novo* review). *See also Steele Cattle, Inc. v. Crist (In re Steele Cattle),* 39 F.3d 1192 (Table), 1994 WL 596627 (Text) (10th Cir.1994) (unpublished disposition) (implying disagreement with district court that Rule 9033 is limited to contempt orders in noncore proceedings, but declining to decide the issue); *In re Winslow,* 186 B.R. 716 at n. 7 (D.Colo.1995) (Kane, J.) (reasoning that if contempt orders related to core proceedings are themselves core proceedings, they should not be subject to standard of review for noncore proceedings, but leaving core/noncore issue for "another day" and applying *de novo* standard under Rule 9033(d)).

■ The action challenged here is the sanctioning of CME for violating § 1125(b) and, in the bankruptcy court's view, for deliberately interfering with the confirmation process it had prescribed pursuant to §§ 1121(e) and 1125(f) as applicable to small business reorganizations.[3] Significant for the purpose of determining the applicable standard of review, however, is that under 11 U.S.C. § 105(a), the court had the inherent authority to impose precisely the same sanction without resorting to the contempt process or Rule 9020. *See Jones v. Bank of Santa Fe*

*(In re Courtesy Inns),* 40 F.3d 1084, 1089 (10th Cir.1994) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S.Ct. 2123, 2135–36, 115 L.Ed.2d 27 (1991) and recognizing bankruptcy courts' inherent power under 11 U.S.C. § 105(a) to "issue any order ... necessary or appropriate to carry out the provisions of this title ... or to prevent an abuse of process" including the imposition of sanctions).[4]

■ Had the bankruptcy court simply sanctioned CME pursuant to its inherent authority, its decision would be reviewed for abuse of discretion only and its factual findings subjected to the clearly erroneous standard. Because it invoked its contempt power to sanction CME, by contrast, the bankruptcy court's decision appears subject to *de novo* review under Rule 9033. *See Skinner,* 917 F.2d at 450, *as applied in Steele Cattle,* 1994 WL 596627 at **3.[5]

## II. *MERITS*

CME raises three issues on appeal. First, CME denies it violated § 1125(b). CME maintains its Letter solicited rejections of the ALS plan, not approval of CME's alternate plan, and that the bankruptcy court erred in finding otherwise. Second, CME argues that even if the Letter technically violated § 1125(b), the bankruptcy court lacked authority to cite it for contempt. Third, because the sanction ordered was punitive, and the contempt therefore criminal as opposed to civil, CME argues the bankruptcy court

3. Specifically, the court invoked its § 105 contempt power to "vindicate the dignity of the Court"; "penalize" CME for violating the solicitation prohibition of 11 U.S.C. § 1125(b); "protect the integrity of, and maintain respect for, the solicitation and balloting procedures under the Code"; and "to establish precedent that compliance with the confirmation provisions of the Code is mandatory" and that failure to comply without first seeking leave will result in the "impos[ition] of a sanction." Contempt Order, ¶ 22.

4. The bankruptcy court implicitly recognized this when it found instructive the Supreme Court's recognition of "courts' traditional powers to summarily adjudicate 'petty direct contempts in the presence of the court ... to maintain order in the courtroom and the integrity of the trial process in the face of an actual obstruction of

justice.'" Contempt Order, ¶ 18 (citing *United Mine Workers of America v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994)).

5. I am concerned that the standard of review turns on the label, rather than the substance, of the order pursuant to which sanctions were imposed. If bankruptcy courts have the inherent authority to sanction litigants' misconduct subject only to an abuse of discretion, the standard should be no different where the sanction is imposed pursuant to an order of contempt. Until the Tenth Circuit resolves the issue, bankruptcy courts will enjoy the greatest autonomy in controlling abusive conduct by invoking their inherent authority to sanction it under 11 U.S.C. § 105, rather than to rely on the contempt process prescribed by Rule 9020.

erred in citing it for contempt without affording it adequate notice.[6]

### A. *Did the CME Letter Violate § 1125(b)?*

Section 1125(b) provides that

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

Section 1125(f)(2) modifies § 1125(b) by permitting acceptances and rejections of a plan to be solicited based upon a "conditionally approved" disclosure statement containing "adequate information."

### 1. *Facts*

The threshold issue in this case is whether CME's conduct in transmitting the CME Letter to creditors violated § 1125(b). The relevant facts are as follows:

1. Debtor ALS filed its initial Plan of Reorganization on August 9, 1995. After filing its Notice of Election to Proceed as a Small Business under § 1121(e) and § 1125(f) and pursuant to an order of the bankruptcy court, ALS filed its First Amended Joint Plan of Reorganization on September 1, 1995.

2. On September 5, 1995, the bankruptcy court entered an order conditionally approving the disclosure statement submitted with the First Amended Joint Plan. That same day, CME filed its competing Liquidating Plan of Reorganization, related disclosure statement and a motion for forthwith conditional approval of its disclosure statement and ballot.

3. A hearing on CME's motion was held September 13 and 14, 1995. At the conclu-

sion of the hearing, the bankruptcy court issued a bench ruling denying CME's motion for forthwith conditional approval without prejudice and on an "interim basis." The court expressed its desire to give ALS a "first opportunity" to solicit approval for its plan. In doing so, the court interpreted 11 U.S.C. §§ 1121(e) and 1125(f), enacted as part of the 1994 Bankruptcy Reform Act, to subject small business debtors "to more liberal provisions for disclosure and solicitation of acceptances for a proposed reorganization plan" than their non-small business counterparts. The court set a hearing for consideration of CME's disclosure statement and the progress of ALS's plan toward confirmation for September 26, 1995. If ALS's progress were found to be inadequate at that time, the court indicated it would reconsider CME's motion for forthwith approval. *See In re Aspen Limousine*, 193 B.R. at 330–31 & n. 7.

In my March 15 memorandum decision, I agreed with the bankruptcy court that allowing the proponent of a competing plan to proceed on the same accelerated basis as a small business debtor under §§ 1121(e) and 1125(f) would place the small business debtor in a worse position than its non-small business counterpart. 193 B.R. at 332–33. Finding this contrary to the letter and spirit of the 1994 Act, I affirmed the bankruptcy court's interpretation of §§ 1121(e) and 1125(f) and the manner in which it had handled the confirmation process. *Id.* at 333.

4. CME, however, believed the bankruptcy "[j]udge to have erred." Rather than wait the 12 days until the September 26 hearing, CME prepared and sent a six-page letter to ALS's creditors apprising them of its alternative plan and urging them to reject the plan proffered by ALS. (A copy of the CME Letter and ballot, dated September 19, 1995, is attached to CME's opening brief as Exhibit A.)

The CME Letter touted the virtues of the CME plan. It stated the plan "is superior in all material respects [to the ALS plan], the most notable being the CME Plan is de-

---

6. CME initially argued the criminal nature of the contempt entitled it to the constitutional protections of proof beyond a reasonable doubt and a jury trial. At oral argument, counsel conceded parties facing criminal contempt are entitled only to those constitutional protections afforded individuals facing commensurate criminal charges. *See* Section II(B)(2), *infra.*

signed to pay creditors 100% only 20 days after the Judge approves [it], with no strings attached." Letter at 1, 2. In a section entitled "ABOUT THE CME PLAN....," CME referred creditors to an attachment "for an illustration on the cash paid out by the CME plan on its effective date, versus the cash paid out by the [ALS] Plan." *Id.* at 2.

While expressly disclaiming that it was "asking for [a] vote in favor of the CME Plan at this time," the Letter informed creditors that CME's alternative plan was scheduled to be considered by the bankruptcy court on September 26, and that "if enough creditors vote NO to the [ALS] Plan, then it is likely the Judge would allow the CME plan to be distributed for consideration by the creditors and a vote." Letter at 2. To accomplish this end, the Letter encouraged creditors to change their votes: "Even if you have already voted yes on the [ALS] plan, because you didn't know there was an alternative, you can vote again with the enclosed ballot." *Id.* at 1.

5. Besides urging rejection of the ALS plan so that CME's plan could be distributed for a vote, the CME Letter was defiant in its criticism of the bankruptcy court's September 14 order and overt in its intent to circumvent it. According to CME, the court had "erred" in keeping creditors "in the dark on the CME plan ... because, by law, creditors in a bankruptcy are entitled to know about alternative plans." [7] Letter at 2. The Letter further stated that because CME felt it had "been disadvantaged by the Judge's decision to disallow the distribution of the CME Plan for consideration by the creditors, we intend to pursue every legal remedy available to forestall the [ALS] Plan should it receive confirmation." *Id.* at 5. "We are not," the Letter exhorted, "going away!" *Id.*

6. ALS filed a motion for an order to show cause why CME should not be held in contempt, (R.Vol. I, Tab 181), which motion

was granted at the September 26 hearing. The matter was set for separate hearing on December 6, 1995.

7. CME continued to pursue its alternate plan, filing an amended plan and disclosure statement on September 25, 1995. Judge Brooks considered CME's amended filings, together with creditors' and ALS's objections thereto, in a written order dated October 5, 1995. The court found certain of the objections meritorious and invited CME to file a second amended disclosure statement addressing them. CME did not, and instead filed an eleventh hour request to continue the October 10 confirmation hearing on ALS's plan. Judge Brooks denied the request as untimely and questioned CME's motives in filing it. The confirmation hearing proceeded as scheduled and ALS's plan was confirmed.

8. At the December 6 hearing, CME was found in contempt. The bankruptcy court issued its Findings of Fact and Conclusions of Law on December 20, 1995. Indicating it had "carefully examined" the CME Letter, the court concluded certain portions "[could] fairly and easily be construed as a **solicitation in favor of CME's pending plan of reorganization, [and] not merely a solicitation against the Debtor's pending Plan."** Contempt Order, ¶ 7 (emphasis original). The court found CME had "exceeded its rights" under § 1125(b) to negotiate with creditors and solicit rejections of ALS's plan, *id.* at ¶ 23–24 (citing *Century Glove v. First Am. Bank of New York,* 860 F.2d 94 (3d Cir.1988)), going "over the line [by] affirmatively, aggressively, and cavalierly soliciting support for its own plan." It determined CME's disclaimer that it "was not asking for your vote in favor of the CME Plan at this time," Letter at 2, to be a "cover" or an "effort to soften an outright solicitation in favor of CME's plan." Contempt Order, ¶ 7, n. 2.

7. This, as I determined in my March 15 memorandum opinion, is incorrect as a matter of law. *See In re Aspen Limousine,* 193 B.R. at 334 (noting § 1125(a)(1) specifically stated that debtors need not disclose the existence of other possible or proposed plans because the purpose of disclosure is "to assist the creditors in evaluating

the plan on its face, rather than to promote a comparison among various proposed plans") (interpreting amendments to § 1125(a)(1) enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, Title III, § 509(a), 98th Cong., 2d Sess. (1984)).

9. In deciding whether to impose sanctions, Judge Brooks acknowledged the CME Letter ultimately did not affect confirmation of the ALS plan and found the disqualification of votes allowed by § 1126(e) for bad faith solicitation was "no remedy at all." Contempt Order, ¶ 20. He determined "a modest and measured sanction" was nevertheless in order because "the integrity of the Bankruptcy Code and the requirement that parties play within certain boundaries in order to have the confirmation process predictable, fair and efficient ... are too important to be ignored." *Id.* ¶¶ 25–26. The court imposed a sanction of $1000 payable to the court, and ordered CME to reimburse ALS's attorney fees and costs incurred as a direct and necessary consequence of CME's improper solicitation. *Id.,* ¶ 26.

### 2. *The CME Letter—Solicitation or Negotiation?*

█ CME does not dispute that § 1125(b) prohibited it from soliciting acceptances of its competing plan before the plan and accompanying disclosure statement had received conditional approval. It simply denies it was doing so. CME maintains it was soliciting rejections of ALS's plan by comparing it with the CME plan as part of "honest negotiations" between creditors. I review the issues raised *de novo.*

█ There is no impediment under § 1125 to the solicitation of acceptances or rejections of a proposed plan of reorganization based solely on the information set forth in an approved (or conditionally approved, in the case of the small business debtor) disclosure statement. When rejections are solicited with additional information, or a proposal is floated for a competing plan, however, parties should proceed with caution. There are divergent views of what constitutes "negotiation" on one hand, and an unlawful "solicitation" on the other.

The seminal case in this area is *Century Glove.* In *Century Glove,* creditor FAB solicited rejections of debtor's plan and sent copies of its alternate plan stamped "draft" to certain creditors that requested it. The bankruptcy court held solicitations under § 1125(b) are limited by the contents of the plan, the disclosure statement, and any other court-approved solicitation material. 74 B.R. 952. It found FAB's unapproved communications with creditors violated § 1125(b) and invalidated certain of their votes. It also imposed sanctions against FAB. *Id.*

The district court reversed, concluding that an interpretation of § 1125(b) to require preapproval of materials accompanying a solicitation would conflict with Code policy of fostering free negotiation among creditors who are considering the merits of a proposed alternate plan. 81 B.R. 274, 278. The court further held that the term "solicitation" in § 1125(b) should be construed narrowly to further this purpose. *Id.* at 279–80. Because FAB explained to creditors that its plan was being provided "for discussion purposes only" and that only the debtor's plan "was on the table," the district court concluded FAB's communications "did not fall within the narrow meaning of solicitation of acceptance." *Id.* at 280.

Affirming, the Third Circuit rejected the bankruptcy court's determination that FAB's communications with creditors were "improper" because the draft plan contained "material omissions" and "inadequate information." *Century Glove,* 860 F.2d at 100–101. Legislative intent in enacting § 1125, the court found, was to provide claim holders with the "adequate information" necessary to aid them in negotiations. The provision "sets a floor, not a ceiling" on the information to be provided claim holders. *Id.* "Once adequate information has been provided a creditor," it concluded, "§ 1125(b) does not limit communication between creditors." *Id.* at 101.

CME contends this holding (and my reliance on it in the March 15 memorandum decision to reject CME's contention that ALS had violated § 1125(b)) [8] is dispositive

---

**8.** In its appeal from the bankruptcy court's order confirming ALS's plan, CME argued ALS violated § 1125(b) by soliciting wage claimants' acceptance of the plan "with other than an approved disclosure statement." I found ALS was not a "person aggrieved" by the plan's confirmation and therefore lacked standing to challenge it. I went on in dicta, however, to reach the issue, and summarily rejected CME's argument under *Century Glove.* 193 B.R. at 341 ("'[o]nce ade-

of the issue on appeal. CME reads *Century Glove* too broadly.

As an initial matter, *Century Glove* is distinguishable. It did not involve a small business debtor pursuing a conditionally approved plan under the accelerated provisions of §§ 1121(e) and 1125(f). Further, the FAB draft plan was sent to creditors with a cover letter requesting their "comments." 860 F.2d at 98. FAB's purpose was found to have been to solicit rejections[9] of Century Glove's plan, "honestly [to] negotiat[e] with other creditors about its unfiled plan" and to "reach a compromise over [its] terms." *Id.* at 101. CME does not even argue it was seeking comments or attempting to "negotiate" with creditors about the terms of the CME plan. There was no request for "comments" or input of any kind. Further, the CME Letter was sent to all creditors, not, as in *Century Glove*, only those who requested information about the alternate plan.

Moreover, *Century Glove* appears to be the high-water mark for parties seeking to solicit rejections of another's plan by comparing it to an unfiled plan of their own. In *In re Apex Oil Co.*, for example, the bankruptcy court specifically held that parties seeking to solicit acceptances or rejections by distributing information not contained in the approved disclosure statement do so "at their peril." 111 B.R. 245, 249 (Bankr.E.D.Pa. 1990). Agreeing that § 1125(b) permits creditors to engage in "free and open negotiations" and does not generally require them to receive prior court approval of all material used to solicit acceptances or rejections of another's plan, the court found such approval necessary if the soliciting party sought to present or suggest an alternate plan that had neither gained prior court approval nor been subject to adequate disclosure. *Id.* at 249–50. Doing otherwise would "allow a party to circumvent the system established by the Bankruptcy Code." *Id.* at 249.

While it did not go so far as to issue a blanket prohibition on solicitations with

unapproved plans, the court in *In re Gulph Woods Corp.*, 83 B.R. 339, 342–43 (Bankr. E.D.Pa.1988), held communications regarding such plans would violate § 1125(b) if they contained "falsehoods or mischaracterizations," or otherwise "distort[ed] the voting process." In *Gulph Woods*, debtor sent a letter urging rejection of a creditor's competing plan together with an enclosed premarked ballot and stamped envelope for returning the ballot to him. Citing approvingly the district court's holding in *Century Glove* that "free negotiation among parties regarding a proposed plan" was to be encouraged, the court nevertheless recognized "some limitation on communications" was necessary "lest the entire process of requiring court approval of disclosure statements be undermined." 83 B.R. at 342. Communications that "would tend to unfairly influence votes," it concluded, would violate § 1125(b).

Applying these principles, the *Gulph Woods* court found the dispatch of the letter itself did not violate § 1125(b), but that the additional dispatch of the premarked ballot and self-addressed envelope did. Sending duplicate ballots was "bound to cause confusion" the court ruled, "because creditors would no[w] be receiving two ballots instead of one ballot in connection with the same voting process." 83 B.R. at 343. Premarking the ballot, it held, was "per se improper." *Id.* Further, the court found it "grossly improper" that the debtor asked creditors to mail their ballots directly to him rather than the plan proponent's counsel. "This," the court held, "directly interfered with the court-approved method of effecting the election." *Id.*

CME's interference with the court-approved method of effecting the election is at the heart of the Contempt Order in this case. Regardless of whether the CME Letter solicited rejections of ALS's plan or acceptances of CME's plan, it was a deliberate and unabashed attempt to circumvent the confirmation and solicitation procedures established

---

quate information has been provided a creditor, § 1125(b) does not limit communication' ").

**9.** I note that in *Century Glove*, the Third Circuit reviewed the bankruptcy court's finding on this issue under the clearly erroneous, and not *de*

*novo*, standard. *See* 860 F.2d at 100 ("the bankruptcy court's factual conclusion that FAB was seeking rejections of Century Glove's plan is not clearly erroneous, and so must be assumed").

by the bankruptcy court. As set forth in the Letter itself, CME believed Judge Brooks "erred" in allowing the ALS "[p]lan to proceed toward a confirmation without any disclosure of the existence of CME's plan," and specifically encouraged creditors that had voted "YES" under the process established by Judge Brooks, to "vote again with the enclosed ballot." CME Letter at 1.

Based on my *de novo* review of the record, I find the CME Letter violated § 1125(b) and (f)(2) because it was a deliberate attempt to interfere with the court-approved method of effecting the election on ALS's plan under the small business debtor provisions of the Code. The language urging creditors to change their votes from "YES" to "NO" is only the most obvious example. *Century Glove* compels no contrary conclusion. It cannot reasonably be asserted, and CME does not attempt to assert, that the CME Letter was transmitted to creditors "for their comments," *c.f. Century Glove* at 98; as a "request for opinions," *id.* at 101; or as part of "honest[ ] negotia[tions] with other creditors about [CME's] unfiled plan." *Id.* It was transmitted to creditors to circumvent the harm CME perceived the bankruptcy court's interpretation of §§ 1121(e) and 1125(b) and (f) had caused its efforts to get the CME plan before creditors.

I find this case more analogous to *Gulph Woods* and conclude that in the context of a small business reorganization, the CME Letter violated § 1125(b) (as modified by § 1125(f)(2)).

### B. *Contempt*

Having found the CME Letter to have violated § 1125(b), I must address whether contempt was an available sanction and, if so, whether the sanctions were appropriately imposed. CME argues the Contempt Order must be reversed on both procedural and substantive grounds. First, CME claims the Order and Notice of Hearing was procedurally defective because it "failed to state the essential facts constituting the contempt charged" and "failed to describe the contempt as criminal or civil" as required under Rule 9020(b). Second, CME asserts the bankruptcy court erred in imposing a contempt sanction for conduct which, under *Century Glove*, was not "clearly unlawful." Third, CME argues violations of § 1125(b) are not sanctionable by contempt.

### 1. *The Availability of Contempt as a Sanction*

■ Because it subsumes the others, I address first the contention that contempt is an unavailable sanction for violating § 1125(b). CME relies on *In re Hunter*, 190 B.R. 118, 119 (Bankr.D.Colo.1995), to support its position. In *Hunter*, Chief Judge Matheson denied debtor's motion for an order to show cause why a creditor should not be held in contempt for violating the automatic stay provisions of 11 U.S.C. § 362. Judge Matheson acknowledged the Tenth Circuit's affirmance, in *Skinner*, of a contempt citation issued by the bankruptcy court for the violation of § 362, but found the appropriateness of contempt as a remedy had "neither been presented to nor decided by" the court in that case. He also found the creditor's conduct fell outside that which is punishable by contempt under 18 U.S.C. § 401.[10] Concluding there was no "authority that would give [him] jurisdiction to punish violations of purely statutory provisions by contempt citations," Judge Matheson denied the motion. 190 B.R. at 119, n. 1.

I am unpersuaded. An inherent element of a court's contempt power is to punish the doing of a forbidden act or the refusal to do that which is required. Section 105(a) of the Bankruptcy Code authorizes bankruptcy judges to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.... [or] to prevent an abuse of process." On at least two occasions, in *Skinner* and *Priddy*, the Tenth Circuit invoked § 105(a) to affirm the imposition of sanctions for violations of spe-

---

10. Section 401 limits courts' authority "to punish by fine or imprisonment, at its discretion, such contempt of its authority ... as
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;
(3) [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."

cific Code provisions. I cannot agree that simply calling CME's conduct a "violation of a purely statutory provision" rather than "an abuse of process" or conduct that interferes with the court's ability to "carry out the provisions of [the Code]" somehow places it beyond the court's reach under § 105(a). Unless and until the Tenth Circuit rules to the contrary, contempt is an available remedy for misconduct such as that in which CME engaged here.

2. *The Appropriateness of the Sanctions*

Having found contempt to be an available sanction for the particular violation of § 1125(b) at issue in this case, I go on to consider the appropriateness of the sanctions imposed.

 I consider first the question whether the sanctions were civil or criminal in nature. The distinction is important because each requires different procedures. Generally, civil contempt sanctions may be imposed pursuant to the minimal procedures of notice and an opportunity to be heard. Criminal contempt " 'is a crime in the ordinary sense,' " and " 'criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings.' " *United Mine Workers v. Bagwell,* —— U.S. ——, ——–——, 114 S.Ct. 2552, 2556–57, 129 L.Ed.2d 642 (1992) (citations omitted).

Under the guidance provided by *Bagwell,* I find the fine imposed to "vindicate the dignity of the court" in this case to have been a criminal sanction. *See Bagwell,* at ——––——, 114 S.Ct. at 2556–60 (where a sanction is imposed retrospectively for a completed act of disobedience, the contempt is criminal). The award of fees and costs incurred "as a direct and necessary consequence of CME's improper solicitation" was a compensatory civil sanction. *Id.* at ——–——, 114 S.Ct. at 2556–57 (if the objective of sanction is to compel compliance with a court order or to compensate complainant for losses sustained, contempt is civil).[11]

Recognizing that most contempt citations seek both to punish and to compel, the bankruptcy rules require that a person be reasonably informed whether he is being proceeded against criminally or only for civil contempt. *See* Fed.R.Bankr.P. 9020(a), (b). Unless the contempt was committed in the presence of the court (in which case it is subject to summary adjudication under Rule 9020(a)) notice must be "in writing" and must "state the essential facts constituting the contempt charged." *Id.*

 Civil proceedings are adequate for indirect criminal contempts involving "discrete, readily ascertainable acts." *Bagwell,* —— U.S. at ——–——, 114 S.Ct. at 2560–62. Criminal proceedings, by contrast, are required for contempts involving out-of-court disobedience to complex injunctions because their adjudication requires elaborate and reliable factfinding. *Id.* at ——, 114 S.Ct. at 2560. The right to jury trial is triggered only for the adjudication of criminal contempts involving imprisonment of more than six months or the imposition of "serious" fines. *Id.* at ——––—— & n. 5, 114 S.Ct. at 2562–63 & n. 5 (quoting *Taylor v. Hayes,* 418 U.S. 488, 495, 94 S.Ct. 2697, 2701, 41 L.Ed.2d 897 (1974) ("[p]etty contempt like other petty criminal offenses may be tried without a jury")).[12]

 Applying these authorities to the record before me, I find the procedures followed by the bankruptcy court adequate to

---

11. For other cases discussing the distinction between civil and criminal contempt, *see United States v. Haggerty,* 528 F.Supp. 1286, 1296 (D.Colo.1981) (Kane J.) (applying *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441–42, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911) in finding contempt criminal); *see generally,* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2960 (2d ed. 1995 & 1996 Pock.Pt.); 3 Charles A. Wright, *Federal Practice and Procedure: Criminal* 2d § 704 (2d ed. 1982 & 1996 Pock.Pt.) (and cases cited therein).

12. The precise magnitude of contempt fine that constitutes a "serious" criminal sanction has not been specified. But the Court in *Bagwell* noted "petty offenses" are defined at 18 U.S.C. § 1(3) as crimes "the penalty for which ... does not exceed imprisonment for a period of six months or a fine of not more than $5,000 for an individual and $10,000 for a person other than an individual, or both." —— U.S. at ——, n. 5, 114 S.Ct. at 2562, n. 5.

have protected the due process rights of CME. CME's conduct in sending the CME Letter was a "discrete, readily ascertainable act" and the fine imposed indicated it was treated as a "petty," rather than "serious," contempt. The court's technical failure under Rule 9020(b) to "state the essential facts constituting the contempt charged" was harmless, given that the order setting the hearing date on the contempt issue also granted ALS's Motion for Order to Show Cause. That motion sufficiently stated the essential facts constituting the contempt, and CME clearly had actual notice of what they were.

■ The fact the court's order failed to describe the contempt as criminal or civil is likewise harmless. Given the "elusive" distinction between civil and criminal contempt generally, and civil and criminal contempt fines specifically, see Bagwell —— U.S. at ————————, 114 S.Ct. at 2559–63, courts often will not know the specific nature of the contempt until after the evidence has been heard and a decision as to the type of sanction to impose has been made. See id. at ————————, 114 S.Ct. at 2562–63 (parsing criminal from coercive civil contempt fines requires examination of the contumacious conduct as well as the character of the fine ultimately imposed). Where, as here, a respondent has notice of its allegedly contumacious conduct and the offense is "petty" rather than "serious" under the Bagwell standard, a court's failure or inability to identify it as civil or criminal in the notice of hearing does not deprive the respondent of due process. This is true because the respondent is entitled to the same procedural protections in either event.

■ Having found the procedures followed by the bankruptcy court adequate, I also find that the particular sanctions imposed to have been warranted by the facts and appropriate in amount.

## III. CONCLUSION

Pursuant to Rule 9033(d), I may "accept, reject, or modify" the bankruptcy court's findings of fact and conclusions of law, or "recommit the matter to the bankruptcy judge with instructions." Based on the foregoing, I ACCEPT the findings of fact and conclusions of law set forth in the bankruptcy court's December 20, 1995 Contempt Order with the following MODIFICATIONS:

1. CME's conduct in sending the CME Letter to creditors less than one week before its request for forthwith conditional approval of its plan was to be reconsidered by the court was not an attempt at "honest[ ] negotiat[ions] with other creditors about its unfiled plan" within the meaning of Century Glove, 860 F.2d at 101. The Letter was a deliberate attempt both to circumvent the bankruptcy court's September 14, 1995 decision denying CME permission to proceed with its plan on the same accelerated basis as ALS and to interfere with the confirmation and disclosure process deemed by the bankruptcy court to apply in small business reorganizations under §§ 1121(e) and 1125(f). The Letter, and in particular its request that creditors change their votes, violated 11 U.S.C. § 1125(b) (as modified by § 1125(f)(2)).

2. Because CME's conduct interfered with the bankruptcy court's ability to "carry out the provisions of [the Code]," it fell within the court's authority to sanction by contempt under 11 U.S.C. § 105(a).

3. The contempt procedures followed by the bankruptcy court before imposing sanctions against CME were adequate and did not deprive CME of due process. Because CME would have been entitled to no greater protections had the contempt been identified as "criminal" versus "civil" in the court's notice of hearing, the court's failure to so identify the contempt was harmless error.

4. The $1000 criminal contempt fine levied against CME for violating § 1125(b) was warranted and appropriate.

5. The award of fees and costs incurred by ALS as a result of CME's contumacious conduct constituted a compensatory civil fine. It, too, was warranted and appropriate. The precise amount of those fees and costs must still be determined in accordance with Bankruptcy Rule 7001.

The parties are to bear their own costs on appeal.