**In re CALIFORNIA FIDELITY, INC., Debtor.**

**Raymond J. DUFF, Appellant,**

v.

**UNITED STATES TRUSTEE and Committee of Unsecured Creditors, Appellees.**

**BAP No. NC–95–2136–RAsV.**
**Bankruptcy No. 95–10110–AJ.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 24, 1996.

Decided June 28, 1996.

Gerald F. Ellersdorfer, San Francisco, CA, for Appellant.

Patricia A. Cutler, San Francisco, CA, for Appellees.

Before: RUSSELL, ASHLAND, and VOLINN, Bankruptcy Judges.

## OPINION

RUSSELL, Bankruptcy Judge:

This appeal arises from the bankruptcy court's order granting the United States Trustee's motion for sanctions against the debtor's principal for soliciting votes within the meaning of § 1125(b)[1]. The debtor's principal appeals. We AFFIRM.

## I. FACTS

On January 19, 1995, California Fidelity, Inc., ("CFI" or "debtor"), a real estate mortgage company, filed for chapter 11 bankruptcy relief. The debtor's bankruptcy petition was signed by its president, Raymond J. Duff ("Duff" or "appellant").

On May 1, 1995, the debtor filed it first plan and disclosure statement. The hearing for approving the debtor's disclosure statement was set for June 6, 1995.

Upon motion by the United States Trustee ("UST"), the bankruptcy court entered an order appointing a chapter 11 trustee on June 27, 1995.

Both the UST and the reconstituted creditors' committee[2] filed objections to the debtor's disclosure statement. At the debtor's request, the bankruptcy court continued the hearing for 30 days. A series of continuances were granted over the next several months resulting in a fourth disclosure statement hearing which was scheduled for September 6, 1995.

On August 2, 1995, Duff attended a creditors' committee meeting to seek the committee's support for his amended liquidating plan. The chapter 11 trustee was also at the meeting to negotiate a competing plan. At the conclusion of the meeting, the committee rejected Duff's proposal and agreed to jointly file the trustee's plan and disclosure statement ("joint disclosure statement/joint plan"). The hearing on the adequacy of the joint disclosure statement was set for September 6, 1995, the same date as the continued hearing on the debtor's disclosure statement.

On August 24, 1995, thirteen days *before* the disclosure statement hearing, Duff disseminated a letter to three hundred (300) of the debtor's unsecured creditors attacking the Department of Justice, the committee, the trustee and the bankruptcy court. Attached to Duff's letter was a letter from Leo Larson, the chair of the creditors' committee, to the other members of the committee advising them, *inter alia*, to reject the joint plan.

On August 31, 1995, after learning about Duff's letter, the UST filed an *ex parte* application for an order shortening time for hearing on a motion for an order limiting communications with creditors and for sanctions. According to the UST, Duff had violated § 1125(b)[3] by soliciting votes from holders of impaired claims or interests before a disclosure statement had been approved.

At the *ex parte* hearing on September 1, 1995, the debtor's attorney, Gerald F. Ellers-

---

1. Unless otherwise indicated, all chapter, section and Rule reference are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

2. The committee was formed on February 8, 1995. At its inception, the committee had only four members. By June 1995, at least 12 additional committee members had been appointed.

3. Section 1125 provides in relevant part:

    **§ 1125. Postpetition disclosure and solicitation.**

    (a) In this section—

    (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would

enable a hypothetical reasonable investor typical of holders of claims or interest of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan; and

    ....

    (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

**570**

dorfer, appeared to argue Duff's position.[4] Ellersdorfer also filed a response to the UST's motion on Duff's behalf.

After considering the pleadings and the oral argument presented by both sides, the bankruptcy court orally granted the UST's motion and as a curative measure, instructed the court clerk to immediately send a copy of the bankruptcy court's decision to all three hundred (300) creditors who had received Duff's letter.

In its Memorandum of Decision, dated September 1, 1995, the bankruptcy court found that Duff had violated § 1125(b) by soliciting votes against the joint plan with false or misleading information and by touting his own plan before a disclosure statement had been approved. The bankruptcy court also ruled that it would assess monetary sanctions against Duff at a later hearing.

Prior to a second hearing on the UST's motion, the UST filed a memorandum requesting sanctions in an amount equal to the costs and fees incurred by the various parties as a result of Duff's letter. In addition, each of the five parties seeking compensation[5] filed declarations with the bankruptcy court indicating the amount of time they expended in connection with Duff's letter and their billable hourly rate.

Before the second hearing, Duff and Ellersdorfer each filed responses in opposition to the UST's request for sanctions. Duff continued to contend that no solicitation had occurred and Ellersdorfer argued that sanctions were inappropriate because the joint plan was ultimately confirmed and, therefore, Duff's actions did not cause any actual harm.

At the second hearing on September 29, 1995, neither Duff nor Ellersdorfer appeared. The bankruptcy court ordered sanctions against Duff for violating § 1125(b) in the amount of $4,422.24.[6] Duff appeals.

## II. ISSUES

A. Whether the letter sent by Duff to the unsecured creditors constituted an impermissible "solicitation" within the meaning of § 1125(b).

B. Whether Duff received adequate notice and a hearing on the UST's motion to limit Duff's communications with creditors and to impose sanctions for an alleged violation of § 1125(b).

C. Whether the bankruptcy court abused its discretion by imposing sanctions for a violation of § 1125(b) and whether the amount of the sanctions was appropriate.

## III. STANDARD OF REVIEW

Whether § 1125(b) has been violated is a mixed question of law and fact. *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 97 (3d Cir.1988). Mixed questions of law and fact are reviewed *de novo*. *Zeier v. IRS*, 80 F.3d 1360, 1360 (9th Cir.1996). However, to the extent an issue within the mixed question can be identified as solely a question of fact, it is subject to a clearly erroneous standard of review. *See Rose v. United States*, 905 F.2d 1257, 1259 (9th Cir.1990).

---

**4.** At the hearing, the bankruptcy court questioned Ellersdorfer on whether he was representing Duff in addition to the debtor based upon the fact that Ellersdorfer was at the hearing and had filed a response on Duff's behalf. Ellersdorfer contended that Duff had not retained him and, therefore, he was not officially representing him. According to Ellersdorfer, he was merely there to make a statement on Duff's behalf.

Apparently, Ellersdorfer was later retained by Duff as he filed a subsequent response on the issue of sanctions and has filed the appellant's brief in this appeal.

**5.** The following people filed requests for compensation: Timothy W. Hoffman, counsel for the chapter 11 trustee; Charles Sims, chapter 11 trustee; William G. Bertain, counsel for the creditors' committee; Michael F. Malloy, co-counsel for the creditors' committee; and Patricia A. Cutler, Assistant UST.

**6.** The declarations submitted to the bankruptcy court requested the following fees and costs: Hoffman, $828.75 in fees; Sims, $760.50 in fees; Bertain, $2,555 in fees and $224.99 in costs; Malloy, $198.00 in fees; and Cutler, $855.00 in fees. These amounts total $5,422.24.

The record is devoid of any explanation for the discrepancy between the sum of the sanctions requested and the actual amount awarded.

■ Similarly, whether the bankruptcy court violated an individual's right to due process is a mixed question of law and fact which is reviewed *de novo*. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (determining whether an interest is within the contemplation of the Fourteenth Amendment is a question of law whereas due process rights depend on the facts of a particular situation). In reviewing a mixed question, separate issues of fact are reviewed for clear error. *Rose,* 905 F.2d at 1259.

■ An order imposing sanctions is reviewed under an abuse of discretion standard. *In re White,* 186 B.R. 700, 703 (9th Cir. BAP 1995) (reviewing a bankruptcy court's exercise of its equitable powers under the abuse of discretion standard). An abuse of discretion occurs if the bankruptcy court applied an incorrect legal standard or its findings of fact are clearly erroneous. *Allen v. Shalala,* 48 F.3d 456, 457 (9th Cir.1995).

## IV. DISCUSSION

Duff's principal argument is that the debtor's bankruptcy filing did not suspend his First Amendment right to freedom of expression. According to Duff, his letter was merely "an expression of his views" and did not violate § 1125(b).

Duff also contends that the bankruptcy court denied him adequate notice and a hearing on the UST's *ex parte* motion to limit communications and for sanctions. With respect to the amount of sanctions, Duff contends that the bankruptcy court abused its discretion in awarding the amount of sanctions requested because he was not served with two of the five declarations submitted to the court and because the declarations were inadequate as they failed to itemize the amount of fees being requested.

The UST contends that Duff's letter clearly violated § 1125(b) because it solicited votes to reject the joint plan before a disclosure statement had been approved and, under the circumstances, sanctions were appropriate.

In response to Duff's due process argument, the UST contends that it was Duff's

actions which created the exigent circumstances requiring the UST to request the hearing on shortened time. In addition, the UST notes that Duff had sufficient time to file a response and to have Ellersdorfer appear at the hearing on his behalf.

Lastly, the UST contends that the amount of the sanctions was appropriate because it reflected the actual cost incurred by the various individuals who were forced to respond to Duff's communication with the unsecured creditors and that by failing to appear at the hearing or have counsel appear on his behalf, Duff waived his opportunity to object to the amount of sanctions.

A. *Whether Duff's Letter to Unsecured Creditors Constituted an Impermissible Solicitation Within the Meaning of § 1125(b)*

■ The purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan. § 1125(a) and (b). Section 1125(b) provides that no one is permitted to "solicit" plan acceptances or rejections until a disclosure statement has been approved by the bankruptcy court and transmitted to creditors along with the proposed plan of reorganization. At a minimum, § 1125(b) seeks to guarantee that a creditor receives adequate information about the plan before the creditor is asked for a vote. *Century Glove,* 860 F.2d at 100 (*citing* the legislative history of § 1125).

In the instant case, it is undisputed that Duff transmitted a letter to all or nearly all of the debtor's unsecured creditors thirteen days *before* the scheduled hearing to approve the creditors' committee's and the chapter 11 trustee's joint disclosure statement. Thus, at the time the creditors received Duff's communication, the creditors were without any court approved information concerning the plan. The parties disagree, however, over the significance of Duff's letter and whether, as a matter of law, it constituted an impermissible "solicitation" under § 1125(b).

The term solicitation as used in § 1125(b) has been narrowly interpreted to mean noth-

ing short of a "specific request for an official vote". *Id.* at 101; *In re Snyder*, 51 B.R. 432, 437 (Bankr.D.Utah 1985). Most courts have reasoned that a broader construction of the term would curtail free and honest negotiations among creditors and, therefore, inhibit creditor participation in the debtor's reorganization. *Century Glove*, 860 F.2d at 100–01.[7]

Relying on a narrow definition of the term "solicitation", Duff contends that no solicitation occurred because his letter did not specifically request an official vote. Thus, we begin by reviewing Duff's letter and the Larson letter which Duff included as part of his communication.

██ Duff's letter informed the unsecured creditors that his original plan which proposed to pay back 100% to investors was rejected by the committee and that his second plan which proposed an 85% pay back was likewise rejected. Duff further explained that the creditors' committee jointly filed a plan and disclosure statement with the chapter 11 trustee and that on September 6, 1995 they were going to "pass" their disclosure statement through. Duff described the proposed joint plan and disclosure statement as follows:

> The Disclosure Statement [and joint Plan] allows for $250,000.00 of our money to be disbursed to the appointees of the court upon confirmation, and then to continue to make further disbursements as per hourly rate schedules. You still receive nothing. The hourly rate, when you consider all the appointees, ie. [sic] the Trustee, his attorney, his accountant and his agents, the Creditors Committee attorney and the attorney for the attorney and his agents, I suspect we are going to be paying somewhere around $1,200.00 per hour, plus 5% of the total assets that pass

through the CFI bank accounts. This is the main reason, in my opinion, that the conclusion of the Trustee, in their Disclosure Statement, calls for a payback to investors of as little as 50%. And that's if their plan works.

> I have included with this letter, a letter I received from Leo Larson dated August 19, 1995. As chairman for the Creditors Committee, he has been on the inside of the situations and circumstances occurring on your behalf. *I agree with him entirely, and I can only hope you follow his recommendations.*

(Emphasis added).

Larson's recommendation to the creditor's committee provided as follows:

> **Sims/Hoffman Joint Plan of Reorganization:** The Sims/Hoffman Joint Plan of Reorganization proposes a similar liquidation plan to Mr. Duff's CFI Plan, but estimates a proposed 50%–75% (actual figure rumored at 60%) payout to creditors over two years. Compared to Mr. Duff's plan— 73.78% disbursed over one year, reduced administrative costs, and a portfolio offer substantiated in writing—the *Sims/Hoffman [Joint] Plan is obsolete, inferior and unacceptable.*

> . . . .

> In comparing which plan to support and adopt, *basic arithmetic* should yield the answer. *I cannot in good conscience recommend the inferior Sims/Hoffman Plan, with its reduced, prolonged payout fraught with hidden administrative costs, to our fellow creditors who are dependent on this committee to look out for their best interests and assure them the greatest return on their monies in the shortest possible time.*

> . . . .

---

**7.** Several courts have also held that *after the disclosure statement has been approved and disseminated with a proposed plan,* a party violates § 1125 if it solicits votes for or against a plan using false or misleading information. *See, e.g., In re Apex Oil Co.,* 111 B.R. 245, 250 (Bankr. E.D.Mo.1990) (holding that a soliciting party may react to and present contrary views regarding the court approved disclosure statement, but may not suggest an alternative plan that has not been approved by the court for adequacy of dis-

closure); *In re Gulph Woods, Corp.,* 83 B.R. 339, 343 (Bankr.E.D.Pa.1988) (holding that a debtor may solicit rejection of a creditor's competing plan, but the solicitation may not contain mischaracterizations, or falsehoods which might unfairly influence voters); *Snyder,* 51 B.R. at 437 (defining impermissible solicitation after adequate disclosure as a request containing misrepresentations, deliberate falsehoods or misleading statements calculated to deceive).

**In summary,** *my wife and I strongly object to the current Disclosure Statement and Joint Plan of Reorganization (Sims/Hoffman Plan). We support adoption of the Amended CFI Plan [Duff's plan]....*

(Italics in original; emphasis added).

Although Duff contends that the purpose of his letter was merely to express his views, it is obvious that the "views" Duff expressed pertained to the virtues of his plan and the alleged weaknesses of the joint plan. Read in conjunction with Larson's letter, Duff's message to the unsecured creditors is abundantly clear: reject the joint plan. Thus, applying even the narrowest definition of "solicitation", we conclude that Duff violated § 1125(b).

## B. *Due Process Considerations*

Duff argues that the bankruptcy court violated his rights to due process by depriving him of sufficient notice and a hearing before determining that his actions violated § 1125(b). Duff's alleged lack of notice stems from the fact that the notice of the trustee's *ex parte* hearing was mailed on August 30, 1995, for a hearing on September 1, 1995. In addition, the notice was addressed to the debtor, not to Duff individually. Because the debtor's mail was being forwarded to the chapter 11 trustee, Duff alleges that he did not receive actual notice of the motion or the hearing.

■ Procedural due process is a flexible concept which, at a minimum, requires notice and a hearing before an individual is deprived of a significant property interest. *Miranda v. Southern Pac. Transp. Co.,* 710 F.2d 516, 522 (9th Cir.1983). Pursuant to Rule 9014, parties are entitled to reasonable notice and an opportunity for a hearing in contested matters. However, the term "notice and a hearing" requires notice and hearing as is appropriate in the particular circumstances. § 102(1)(A).

■ It appears that the UST's motion was scheduled to be heard on shortened notice based upon the bankruptcy court's stated concern that the hearing to determine the adequacy of the joint disclosure statement was less than a week away and, assuming that the bankruptcy court determined Duff's communication violated § 1125(b), there was limited time for Duff to recant or to take other curative measures before the hearing.

Although Duff argues that he did not receive actual notice of the *ex parte* hearing and the motion, he admits that Ellersdorfer received a facsimile of the notice and contacted him about it. In addition, despite the short notice, Ellersdorfer was able to file a response on Duff's behalf before the hearing. Although Duff was unable to attend the hearing, Ellersdorfer appeared and strenuously argued Duff's position.

Furthermore, the bankruptcy court conducted a second hearing on the UST's request for sanctions four weeks later. Duff clearly had notice of the subsequent hearing because he and Ellersdorfer filed responses to the UST's memorandum in support of sanctions. For reasons that are not clear from the record, however, neither Duff nor Ellersdorfer attended the second hearing. Based upon the record before the Panel, we see no support for Duff's contention that he was denied due process.

## C. *Sanctions for Violating § 1125(b) and Whether the Amount of Sanctions was Appropriate*

■ It is within the inherent authority of the bankruptcy court to sanction conduct that violates the bankruptcy laws. *In re Rainbow Magazine, Inc.,* 77 F.3d 278, 283–84 (9th Cir.1996) (reaffirming that Congress granted bankruptcy court certain inherent powers in § 105(a) including the ability to sanction). Thus, after determining that Duff violated § 1125(b), the bankruptcy court had the authority to impose sanctions. *See, e.g., Gulph Woods,* 83 B.R. at 343 (imposing sanctions for a violation of § 1125(b)); *In re Rook Broadcasting of Idaho, Inc.,* 154 B.R. 970, 976 (Bankr.D.Idaho 1993) (same).

Duff asserts, assuming *arguendo* that the bankruptcy court did not abuse its discretion in imposing sanctions, that under the circumstances the amount of the sanctions was unreasonable. Specifically, Duff argues that the declarations did not itemize the amounts

requested and that Duff did not receive two of the declarations relied on by the bankruptcy court. Duff also suggests that there was no actual harm caused by his letter because the joint plan was ultimately confirmed.

In hindsight, it appears that Duff's letter did not taint the voting process. However, we agree with the bankruptcy court that it was only through the efforts of the various parties involved and their expeditious response that this did not happen. Accordingly, it was appropriate for the bankruptcy court to impose sanctions in an amount that compensated the parties involved. *See, e.g., Century Glove,* 74 B.R. 952, 958 (Bankr. D.Del.1987), *aff'd in part and reversed in part, First American Bank of New York v. Century Glove, Inc.,* 81 B.R. 274 (D.Del. 1988), *aff'd,* 860 F.2d 94 (3d Cir.1988); *Rook Broadcasting,* 154 B.R. at 976.

We are not persuaded by Duff's further contention that he was denied due process because he was not served with two of the five declarations that the bankruptcy court relied on in determining the amount of costs and fees to award. Duff was on notice that the UST had requested sanctions in an amount that would compensate the various parties for costs they incurred in seeking redress of Duff's letter and in responding to creditor inquiries. Had Duff been concerned that he did not receive the declarations or that the three declarations he received were insufficient, Duff should have submitted a written objection to that effect or he should have appeared at the hearing. Having received no evidentiary objection to the declarations, either in writing or at the hearing, the bankruptcy court did not err in relying on all five declarations in determining the amount of sanctions to award.

## V. CONCLUSION

Duff violated § 1125(b) by soliciting votes to reject the joint plan before a disclosure statement had been approved by the bankruptcy court and distributed to creditors along with a proposed plan. Based upon this violation, it was not an abuse of discretion for the bankruptcy court to impose sanctions against Duff in an amount equal to the fees and the costs of the parties involved.

We also conclude that Duff was not denied due process in the proceedings before the bankruptcy court. Accordingly, we AFFIRM.