## In re CLAMP–ALL CORPORATION, Debtor.

### Bankruptcy No. 97–44344–HJB.

United States Bankruptcy Court, D. Massachusetts.

May 7, 1999.

---

9. Accordingly, the Reconsideration Motion will be denied as moot.

Steven A. Kressler, Kressler & Kressler, P.C., Worcester, MA, for debtor.

Charles R. Bennett, Jr., Reimer & Braunstein, Boston, MA, for Anthony J. Foresta, Caliber Consulting Corp.

HENRY J. BOROFF, Bankruptcy Judge.

### MEMORANDUM OF DECISION

Before the Court is a "Motion for Determination of Bad Faith Filing and for Order Disallowing Plan Voting" (the "Plan Voting Motion") and a "Motion for Order to Show Cause why Anthony Foresta ('Foresta') and Caliber Consulting Corporation ('Caliber') should not be held in Contempt of

Court and for Imposition of Sanctions" (the "Motion for Sanctions") (collectively the "Motions"), filed by Clamp–All Corporation ("Clamp–All" or the "Debtor"). Foresta and Caliber, creditors of the Debtor, filed oppositions to the Motions. The questions presented are whether Foresta and Caliber unlawfully solicited the votes of other creditors in violation of 11 U.S.C. §§ 1121(b) and 1125(b) and Fed. R.Bankr.P. 3017(a), and if so, what remedy is most appropriate.

## I. *Facts*

The relevant facts are not in dispute.

Clamp–All, a Massachusetts corporation formed in 1977, is in the business of manufacturing stainless steel couplings for use in plumbing applications. The Debtor was formed by a Fred Swartz who, together with his son, owned all of its common stock. Some years later, Foresta and an individual named Gustavson purchased a majority interest in the Debtor and later became its sole shareholders.

In 1989, Clamp–All encountered financial difficulties and filed a Chapter 11 petition in this District. Its reorganization plan was confirmed in 1991. Pursuant to that plan, Foresta resigned as president of the company and David Palmer, the company's general counsel, took over. In consideration of Foresta's resignation, the Debtor and Foresta entered into an employment agreement, pursuant to which it was arranged that Foresta and Caliber, a company established by Foresta, would perform marketing, promotion, and con-

sulting services on behalf of Clamp–All.[1] However, by 1993, their business relationship had soured. Clamp–All sued Foresta for breach of contract in the Massachusetts Superior Court (the "Superior Court"). Foresta subsequently counterclaimed.

Clamp–All's claims against Foresta were ultimately dismissed with prejudice by the Superior Court in September 1996 on account of Clamp–All's failure to prosecute the action—and judgment was entered for Foresta on all counts of his counterclaim.[2] A hearing was then scheduled to determine the amount of damages to be assessed against Clamp–All on Foresta's counterclaim. Clamp–All has attempted, to date unsuccessfully, to have the Superior Court judgment vacated. On June 23, 1997, the date of the proposed hearing on damages, Clamp–All filed its second petition in this court under Chapter 11 of the Bankruptcy Code.

On January 7, 1998, this Court granted Foresta relief from the automatic stay to return to the Superior Court to conclude the hearing on damages and finalize the judgment against the Debtor.[3] In March 1998, the Superior Court determined that the Debtor was liable to Foresta in the amount of $15,775 and to Caliber in the amount of $723,906.[4] After a hearing in this Court, Foresta and Caliber were then granted leave to amend Foresta's previously filed claim to conform to the monetary judgment issued in the Superior Court and to bifurcate the claim between

1. Foresta was the president and sole shareholder of Caliber, a Massachusetts corporation with its usual place of business at Foresta's then residence in North Andover, Massachusetts. Caliber provided the marketing services to Clamp–All and was paid for such services by Clamp–All. Foresta, in turn, received his compensation from Caliber.

2. The Debtor has filed a malpractice action against the attorney who represented the Debtor in the Superior Court action and predicts that the recovery will provide a poten-

tially large source of funding for its plan of reorganization.

3. The Debtor appealed that decision to the Bankruptcy Appellate Panel for the First Circuit. The Appellate Panel dismissed the appeal on April 22, 1998.

4. The Superior Court may also award additional sums to Foresta and Caliber for interest and attorney's fees, but has not yet entered final judgment.

Foresta and Caliber.[5] Foresta and Caliber together now hold the largest unsecured claims against the Debtor's estate.

On July 24, 1998, after three extensions of the exclusivity period under 11 U.S.C. § 1121(b), the Debtor filed its disclosure statement and plan of reorganization. The plan divided creditors and equity security holders into seven (7) classes and treated the different classes as follows. In Class 1, the claim of a non-insider secured creditor was offered full repayment, but over time with terms slightly altered from those extant prepetition. In Class 2, the claim of an insider secured creditor was substantially subordinated. In Class 3, the claims of a creditors' trust arising from the Debtor's first trip to Chapter 11 was offered payment in full, but over a longer term. In Class 4, unsecured creditors were offered payment in full on the effective date, if they had claims which did not exceed (or were reduced to) $10,000; the remaining unsecured creditors (other than Foresta and Caliber) were offered payment in full within one year. In Class 5, Foresta and Caliber were offered payment of the amount ultimately determined to be owing to them, but the payment was to be made by a mixture of cash over time and preferred stock. Class 6 consisted of the interests of preferred stockholders whose rights were altered in a fashion not material here. Class 7 consisted on the interests of the common stockholders, who would retain their interests and provide additional consideration to the Debtor in a unique manner not material here.

In response, Foresta and Caliber filed the following pleadings: (1) an "Objection of Adequacy of the Debtor's Disclosure Statement" ("Objection to Disclosure Statement"); (2) a "Motion to Terminate Exclusivity Period for Acceptances of Plan" ("Motion to Terminate Exclusivity"); and (3) an "Objection to Debtor's Classification of the Claims of Foresta and Caliber" ("Objection to Classification"). Attached as an exhibit to the Objection to Disclosure Statement was a *full copy of a disclosure statement and reorganization plan proposed by Foresta and Caliber.* All three pleadings and attachments were served on the *entire creditor body* of the Debtor. The Foresta and Caliber plan

---

5. At the hearing, the Debtor asserted two arguments against allowing Foresta to amend his claim. First, the Debtor argued that the Superior Court's assessment of damages against Caliber was void because only Foresta, and not Caliber, had been granted relief from the automatic stay. Second, the Debtor asserted that Caliber's failure to file a timely proof of its claim precluded it from doing so now.

This Court agreed with the Debtor that Caliber was obligated to get relief from the automatic stay before it proceeded with the damages hearing in Superior Court. However, at that damages hearing, the Debtor never complained that Caliber was in violation of the stay. Therefore, the Court ruled the Debtor estopped from asking that the Superior Court judgment now be deemed void. Moreover, even if Caliber had requested such relief following the judgment in Superior Court, this Court would likely have modified the automatic stay post-facto. The claims were the same; *the Debtor was fully on notice of those* claims; and only the ownership of the claims was different. Foresta had already been granted relief from the automatic stay to proceed with the damages hearing and, if requested, the Court would have granted the same relief to Caliber. *See* June 2, 1998, Hrg. Tr. at 28–30.

This Court further ruled that Caliber's alleged late filing of its claim was equivalent to a simple substitution of the real party in interest for a related party mistakenly listed in an original proof of claim. No prejudice had occurred to the Debtor by virtue of substituting Caliber for some portion of the claim. *See* June 2, 1998, Hrg. Tr. at 27–28. Therefore, Foresta was allowed to amend his claim to the amount of the Superior Court judgment and to bifurcate his original proof of claim between himself and Caliber. *See also Gens v. Resolution Trust Corp.*, 112 F.3d 569, 575 (1st Cir.1997) (quoting *Unioil, Inc. v. H.E. Elledge (In re Unioil, Inc.),* 962, F.2d 988, 992 (10th Cir.1992)) ("[I]n order to 'fairly alert' the debtor estate, a [proof of claim] need only 'provide [ ] adequate notice of the existence, nature, and amount of the claim as well as the creditor's intent to hold the estate liable.' ").

The Debtor has subsequently appealed this ruling to Bankruptcy Appellate Panel for the First Circuit. The appeal is still pending.

offered far more attractive treatment of unsecured creditors than the plan proposed by the Debtor during its period of exclusivity. In fact, it offered all creditors payment in full on the effective date of the plan.

In their papers, Foresta and Caliber argued that the Debtor's disclosure statement failed to provide creditors adequate information to enable them to make an informed decision about the Debtor's plan. They also asserted that the plan's proposal to separately classify their claims from those of other unsecured creditors was unfair, discriminatory and was an improper gerrymandering of claims for voting purposes. Finally, they requested that the Court terminate the Debtor's period of exclusivity under 1121(b) and (d) so that they could file and solicit acceptances for the proposed plan that was attached to their pleadings.

The Debtor, in turn, filed objections to Foresta and Caliber's pleadings. The Debtor argued that its disclosure statement contained adequate information and, even were such information lacking, Foresta and Caliber had failed to comply with Massachusetts Bankruptcy Local Rules 3017–1(b) and (c), which require, inter alia, that an objector contact a plan proponent in an attempt to resolve differences and, failing that effort, file a certificate of compliance with the local rule.[6] The Debtor further denied that its reorganization plan was improper. Finally, the Debtor argued

that the inclusion of a proposed disclosure statement and reorganization plan in the opposition filed by Foresta and Caliber violated 11 U.S.C. §§ 1121(b) and 1125(b).

Following a hearing on the foregoing matters, this Court agreed that the Debtor had improperly classified Foresta and Caliber's claims. *See* Sept. 15, 1998 Hrg. Tr. at 21–22. However, the Court determined to give the Debtor another exclusive opportunity to propose a confirmable plan, noting that based on the litigation in the Superior Court and "on [the] disclosure to creditors and [the] dissemination of a proposed competing disclosure statement" by Foresta and Caliber, the Debtor had still not had a meaningful opportunity to propose a confirmable plan to its creditors. *See* Sept. 15, 1998 Hrg. Tr. at 27–28. As a result, approval of the Debtor's disclosure statement was denied and the exclusivity period was further extended.

Soon thereafter, the Debtor filed the instant Plan Voting Motion and Motion for Sanctions. The Debtor asserts that Foresta and Caliber violated 11 U.S.C. §§ 1121(b), 1125(b) and Fed.R.Bankr.P. 3017(a) by filing and sending to all creditors as part of their opposition papers a proposed disclosure statement and reorganization plan during the Debtor's exclusivity period. Foresta and Caliber oppose, arguing that their actions did not violate either the Bankruptcy Code or the Rules. After a hearing on the Motions and corre-

---

**6.** Massachusetts local rule 3017–1 provides in relevant part:

Rule 3017–1 Approval of Disclosure Statements in Chapter 11 Cases

. . . .

(b) Prior to filing an objection to a disclosure statement counsel to the party who intends to object to the adequacy of the disclosure statement shall contact counsel to the plan proponent and confer by telephone or in person in a good faith effort to narrow areas of disagreement.

(c) An objection to the disclosure statement shall be filed and served on the debtor, the United States trustee, the plan proponent, any chapter 11 trustee, any examiner, all members of any committee appointed un-

der the Bankruptcy Code and its counsel and any other entity that has requested service of pleadings in the case or which has been designated by the Court. Any objection to the adequacy of a disclosure statement shall contain a certificate stating that the conference required by section (b) was held, the date and time of the conference and the names of the participating parties, or a statement detailing the reasons why the conference was not held. The Court may overrule without a hearing objections that are not accompanied by the conference certificate.

The Court acknowledges, but has not addressed, this violation separately.

sponding objections, the Court took the matters under advisement.[7]

## II. *Positions of the Parties*

The Debtor argues that Foresta and Caliber violated § 1125(b) by soliciting votes against its reorganization plan with false and misleading information and by promoting their own plan during the Debtor's exclusivity period and before a disclosure statement had been approved by the Court. Consequently, the Debtor requests that the Court invalidate Foresta and Caliber's right to vote on the Debtor's proposed plan pursuant to 11 U.S.C. § 1126(e) and disallow any plan which Foresta and Caliber might file in the future, pursuant to § 1129(a)(3). In addition, the Debtor asks this Court to impose sanctions against Foresta and Caliber and/or find them in contempt of court.

Foresta and Caliber contend that their actions did not constitute an improper "solicitation" under 11 U.S.C. § 1125(b). They argue that the term "solicitation" should be construed narrowly to mean nothing short of a specific request for an official vote. Under this definition, they maintain, their actions can not be construed as a solicitation because they did not request any votes on their disclosure statement and plan, marked and referred to only as proposals and/or drafts. Moreover, they assert that their actions were not in bad faith and did not taint the plan approval process.

## III. *Discussion*

Section 1125(b) states, in pertinent part, that:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.[8]

11 U.S.C. § 1125(b).

Under section 1125(b), neither acceptances nor rejections of a Chapter 11 plan of reorganization may be solicited after the filing of the petition unless a disclosure statement has been approved by the court. The purpose of requiring an approved disclosure statement is to ensure that all claim holders are provided with adequate information to enable them to make an informed judgment regarding whether to vote for or against a reorganization plan. *In re Ferretti,* 128 B.R. 16, 18 (Bankr.D.N.H.1991). It is only after the court has determined that the information contained within a disclosure statement is adequate can claim holders receive solicitations requesting their acceptance or rejection of the plan.

The terms "solicit" and "solicitation" are not defined in the Bankruptcy Code or in its legislative history. *In re Snyder,* 51 B.R. 432, 436 (Bankr.D.Utah 1985). Consequently, what constitutes a "solicitation" under § 1125(b) is a matter left for determination by case law. The few courts that have addressed the question have struggled to find a precise definition for the

7. On December 18, 1998 the Debtor filed an amended disclosure statement and reorganization plan. A hearing on the adequacy of the Debtor's amended disclosure statement has been continued generally pending this Court's determination on the Debtor's Plan Voting Motion and Motion for Sanctions. Similarly, the Debtor's exclusivity period has been continued pending resolution of these issues.

8. Adequate information means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan[.]" 11 U.S.C. § 1125(a).

term. A definition too broad could limit a debtor's postpetition negotiations with its creditors. A definition too narrow could hinder the court's ability to ensure that claim holders receive adequate information before deciding how to vote on a plan or might eviscerate Congress' intention to provide the Chapter 11 debtor an exclusive period within which to propose a plan. As a result, distinguishing between permissible negotiations and prohibited solicitations has been a difficult task. *See* 4 Norton Bankruptcy Law and Practice 2d § 91:17 (1997). Neither the First Circuit Court of Appeals nor the lower courts within this circuit have yet addressed the issue.

A number of courts have proffered a narrow reading of the term. In the leading case of *Century Glove v. First Am. Bank of New York*, 860 F.2d 94, 101 (3d Cir.1988), the Court of Appeals for the Third Circuit construed "solicitation" narrowly, agreeing with the district court that the term referred "only to a specific request for an official vote." *Century Glove*, 860 F.2d at 101 (citing *Snyder*, 51 B.R. at 437). In *Century Glove*, the debtor filed its plan and sought acceptance of the plan from the creditor body, all within its exclusivity period. At the same time, a plan opponent transmitted a copy of its yet unfiled plan to one of the debtor's largest creditors. The debtor subsequently argued that the plan opponent had improperly solicited and procured the rejection vote of the subject creditor. The Third Circuit disagreed, ruling that a party does not solicit acceptances when it presents a draft plan for the consideration of another creditor, so long as the party does not request that creditor's vote. *Century Glove*, 860 F.2d at 102.

The Third Circuit opined that allowing a draft competing plan to be circulated during the debtor's exclusivity period did not offend the language or policy of 11 U.S.C. § 1121(b).[9] *Century Glove*, 860 F.2d at 102. According to the court, § 1121 provides a debtor with the temporary exclusive right to *file* a plan, not a right to have its plan considered exclusively. *Id.* "The ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals." *Id.* A broad exclusivity provision allowing only the debtor's plan to be "on the table," the court explained, would give a debtor undue bargaining leverage and inhibit creditor negotiations. *Id.* Therefore, the court concluded that sections 1121(b) and 1125(b) ought to be interpreted narrowly to allow a party to present a draft plan for the consideration of another creditor so long as the plan proponent does not request the creditor's vote. *Id.*

A majority of courts have now adopted the narrow reading of "solicitation" proffered by *Century Glove. See Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571–72 (9th Cir.

---

9. Section 1121 which governs "Who may file a plan" provides in relevant part:

(a) The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case or an involuntary case.

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—

(1) a trustee has been appointed under this chapter; or

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class claims or interests that is impaired under the plan.

(d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section.

11 U.S.C. § 1121.

BAP 1996) (recognizing that solicitation has been interpreted as a "specific request for an official vote" and that "[m]ost courts have reasoned that a broader construction of the term would curtail free and honest negotiations among creditors and, therefore, inhibit creditor participation in the debtor's reorganization."); *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D.Mich.1998) ("Solicitation, then, is the process of seeking votes for or against a plan."); *In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 391 (Bankr.N.D.Ga. 1994) (holding that "section 1125 'solicitation' is usually construed very narrowly."); *In re Kellogg Square Partnership*, 160 B.R. 336, 340 (Bankr.D.Minn.1993) ("[T]here is no ... reason not to apply Century Glove's rationale to the debtor in reorganization, so as to [describe] the concept of 'solicitation' as [equivalent to] the polling process."); *In re Gilbert*, 104 B.R. 206, 214 (Bankr.W.D.Mo.1989) (agrees with Third Circuit that a broad definition of solicitation would tend to chill creditor negotiations).

Other courts, however, have criticized such a narrow definition of "solicitation" when a creditor's communication includes information not raised by an approved disclosure statement. In *In re Temple Retirement Comm.*, 80 B.R. 367, 369 (Bankr. W.D.Tex.1987), the court concluded that a letter proposed by the indenture trustee to bondholders during the debtor's exclusivity period—suggesting that another plan awaited bondholders if they rejected the debtor's plan—violated §§ 1121(b) and 1125(b). The court ruled that furnishing information outside the scope of the debtor's plan and disclosure statement or other court approved solicitation materials during the debtor's period of exclusivity was impermissible, and allowing a plan opponent to provide creditors with a proposed competing plan and unapproved disclosure statement would violate the "clear advantage" the Bankruptcy Code was designed to give to the debtor. *Temple Retirement Comm.*, 80 B.R. at 369.

Other courts have also applied the term solicitation more expansively. *See In re Apex Oil Co.*, 111 B.R. 245, 249 (Bankr. E.D.Mo.1990) ("[S]oliciting party may react to and present contrary views regarding the court-approved disclosure statement, but may not present or suggest an alternative plan which has not been subject to court scrutiny regarding the adequacy of disclosure."); *Colorado Mountain Express, Inc. v. Aspen Limousine Serv., Inc. (In re Aspen Limousine Serv., Inc.)*, 198 B.R. 341, 348–49 (D.Colo.1996) (letter sent by plan opponent to all debtor's creditors apprizing them of its unapproved alternative plan and urging them to reject debtor's plan violated § 1125(b)); *In re Rook Broadcasting of Idaho*, 154 B.R. 970 (Bankr.D.Idaho 1993) (sanctions were imposed when party distributed unapproved disclosure statement and reorganization plan to debtor's entire creditor body); *In re Gulph Woods Corp.*, 83 B.R. 339, 342 (Bankr.E.D.Pa.1988) (recognizing that there must be some limitation on communications, or else the entire process of requiring court approval of disclosure statements would be undermined).

■ This Court agrees that open negotiation by creditors is imperative. However, those negotiations must be conducted in a manner consistent with the policy goals intended by Congress to be effectuated through sections 1121(b) and 1125(b) of the Bankruptcy Code. This Court must, therefore, turn to those policy goals for guidance.

### 1. *Debtor's Exclusive Plan Filing Rights under § 1121*

Section 1121 of the Bankruptcy Code grants the debtor the exclusive right to file a plan during the first 120 days after entry of the order for relief. 11 U.S.C. § 1121(b). If the debtor files a plan within that time, the debtor is granted an additional 60 days within which to obtain acceptance of the plan. The bankruptcy court in its discretion may reduce or increase the debtor's period of exclusivity.

11 U.S.C. § 1121(d). The debtor's failure to timely file its plan or have it accepted by creditors within the period of exclusivity are among those conditions which may terminate that right of exclusivity. Any other party in interest may then file its own plan of reorganization and seek approval of its disclosure statement. 11 U.S.C. § 1121(c).

Legislative history identifies the purpose of § 1121 and the competing interests which Congress sought to balance in enacting these time tables. *Matter of All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr.N.D.Ind.1990).

> Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to **propose** a plan for 120 days. In most cases, the 120 days will give the debtor adequate time to negotiate a settlement without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120 day period depending on the circumstances of the case ... [T]he bill allows flexibility for individual cases[.]

H.R.Rep. No. 595, 95th Cong., 1st Sess. 231–32 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6190–92 (emphasis added). Congress explicitly sought to achieve two goals. It wanted to grant the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan. And at the same time, Congress sought to ensure that a debtor would not use Chapter 11 as a mechanism through which to operate indefinitely without attempting to reorganize. *See Matter of Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr.W.D.Mich.1993); *In re River*

*Bend–Oxford Assocs.*, 114 B.R. 111, 114 (Bankr.D.Md.1990).

Section 1121 provides the debtor with a clear advantage early in the case. "It was intended that at the outset of a Chapter 11 case a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr.S.D.N.Y.1988) (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 221–22, reprinted in 1978 U.S.C.C.A.N. 5787). The exclusivity period gives the debtor the ability to stabilize its operations and the opportunity to retain control over the reorganization process. The adoption of a limited period of exclusivity also assures speed by motivating the debtor to be more fair and reasonable in its negotiations with creditors, because the debtor knows that the bargaining leverage of exclusivity will soon end.

In reviewing the legislative history of § 1121, the Third Circuit, in *Century Glove*, seemed to focus solely on Congress' intention to limit a debtor's exclusivity period to prevent unreasonable delays in formulating a reorganization plan. *Century Glove*, 860 F.2d at 102. Specifically the court noted that, "[s]ection 1121 allows a debtor the threat of limited delay to offset the creditors' voting power of approval." *Id.* The court also stated "[t]he costs of delay was a prime reason the debtor was given a limited 'exclusivity period' to present its reorganization plan." *Id.* at 101 n. 7. Employing its interpretation of legislative history, the court held that a plan opponent's submission of an unapproved disclosure statement and reorganization plan to a creditor did not reduce the debtor's threat of limited delay, and, therefore, did not violate the terms of § 1121. *Id.* at 102.

This Court believes that the *Century Glove* analysis fails to sufficiently recognize Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing

plan. Therefore, whether a creditor's action during the exclusivity period violates § 1121(b) must be evaluated not only in terms of its effect on the ability of a debtor to delay reorganization, but also in terms of its interference with the debtor's efforts to propose and confirm a plan of reorganization. *See* Barbara E. Nelan, *Multiple Plans 'On The Table' During the Chapter 11 Exclusivity Period*, 6 Bankr.Dev.J. 451, 476 (Fall, 1989); *see also Temple Retirement*, 80 B.R. at 369 (When a party in interest proposes an unapproved draft plan to other creditors, it is in effect "solicit[ing] rejections by dangling an alternative plan before other creditors, suggesting in essence that, if the debtor's plan were scuttled, then a better alternative could then be proposed.").

■ Based on Congress' policy goals as expressed in the Code's legislative history, this Court concludes that § 1121 provides the debtor with the exclusive right to propose a plan during its exclusivity period.

### 2. Adequate Disclosure under § 1125

The requirement of adequate disclosure to parties in interest is a key feature of the reorganization provisions of Chapter 11. H.R.Rep. No. 595, 95th Cong., 1st Sess. at 226 (1977), reprinted in 1978 U.S.C.C.A.N. 5963. Legislative history illustrates Congress' belief that "[i]f adequate disclosure is provided to all creditors and stockholders whose rights are to be affected, then they should be able to make an informed judgment of their own[.]" *Id.* Congress recognized that if creditors and other parties in interest were provided with financial and other adequate information regarding a debtor's business and plan of reorganization, they would be in a far better position to make an informed decision about whether to accept or reject a proposed plan.

■ Section 1125 furthers those goals by requiring that a written disclosure statement, approved by the bankruptcy court as containing adequate in-

formation, be transmitted to creditors, together with a plan or a summary of the plan, *prior* to any post-petition solicitation of votes for or against the plan. 11 U.S.C. § 1125(b). The requirement of advance court approval ensures that adequate information is provided to creditors and parties in interest and "was thought to discourage the undesirable practice (under the former Bankruptcy Act of 1898, as amended) of soliciting acceptance or rejection at a time when creditors and stockholders were 'too ill-informed to act capably in their own interests.'" Paul R. Glassman, *Solicitation of Plan Rejections Under the Bankruptcy Code*, 62 Am.Bankr.L.J. 261, 264 (Summer, 1988) (quoting 6 *Collier on Bankruptcy* ¶ 7.39 at 1322–1323 nn. 10–13 (14th ed.1978)). Moreover, prohibiting solicitations before court approval of a disclosure statement "protect[s] against 'end-runs' around the disclosure requirements." H.R.Rep. No. 595, 95th Cong., 1st Sess. at 227 (1977), reprinted in 1978 U.S.C.C.A.N. 5963.

■ Bankruptcy Rule 3017 supplements § 1125 by establishing strict guidelines on the process of obtaining court approval of a disclosure statement:

> The plan and the disclosure statement shall be mailed with the notice of the hearing *only* to the debtor, any trustee or committee appointed under the Code, the Securities and Exchange Commission and any party in interest who requests in writing a copy of the statement or plan.

Fed.R.Bankr.P. 3017(a) (emphasis added). The rule forbids sending copies of a plan and disclosure statements to any party other than those explicitly mentioned. "The Bankruptcy Code's requirement of court approval of a disclosure statement, combined with Rule 3017's restrictions on dissemination of an unapproved disclosure statement, clearly contemplates some creditors need to be protected against misinformation." *Rook Broadcasting*, 154 B.R. at 976. Undoubtedly this prohibition was

intended to preclude yet another "end-run" by providing creditors with inadequate or misleading information in draft plans and disclosure statements. As one court aptly stated:

> Permitting a plan proponent to distribute proposed disclosure statements taints the voting process. Those creditors who are ignorant of the debtor and its affairs, the ones for whose protection section 1125 requires court approval of the disclosure statement, would instead be presented with numerous documents containing inconsistencies, omissions, and misleading or incorrect statements. The debtors and the Court would be forced to attempt to 'chase down' these problems, with little real hope of undoing the damage.

*Id.*

■ This Court acknowledges the *Century Glove* court's concern that a broad reading of § 1125(b) could limit creditor communications and negotiations. However, negotiations among creditors may be fostered without discussing unapproved alternate plans. Parties opposing a debtor's plan are not prohibited from soliciting rejection of the proposed plan by "arguing that [a] [d]ebtor's plan does not exhaust the panoply of possibilities for reorganization, nor are they prohibited from pointing out failings which they perceive to be present in the [d]ebtor's plan." *Temple Retirement*, 80 B.R. at 369. In addition, the hearing on approval of the disclosure statement gives interested parties the opportunity to challenge certain statements or information contained in the disclosure statement and an opportunity to request the inclusion of additional facts which makes apparent their objections to the debtor's plan. *Id.; see also In re Media Central, Inc.*, 89 B.R. 685, 690 (Bankr. E.D.Tenn.1988). Therefore, to find "that prohibiting the distribution of an alternative plan without a[n approved] disclosure statement, during the debtor's exclusivity period, would be fatal to effective negotiations or evaluation of a Chapter 11 plan,

ignores all other methods by which plan opponents can fairly communicate and solicit rejections." *Nelan, supra* at 475. Non-debtor parties must be prohibited from circulating solicitation materials before a disclosure statement has been approved by the court. Only then can adequate disclosure to creditors and other parties in interest be assured. *Apex Oil*, 111 B.R. at 249–50.

IV. *Application*

■ It is undisputed that Foresta and Caliber transmitted their proposed competing plan of reorganization and unapproved disclosure statement to all of the Debtor's creditors while the Debtor had the exclusive right to propose a reorganization plan and before the scheduled hearing to approve its disclosure statement. As a result, Foresta and Caliber's actions undermined the Debtor's ability to propose a confirmable plan and circumvented the adequate disclosure requirements of the Bankruptcy Code. In so doing, Foresta and Caliber violated sections 1121(b) and 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3017(a).

More problematic is choosing the appropriate remedy for those violations. Courts have employed various solutions to ameliorate the harm. Some have imposed a monetary sanction under 11 U.S.C. § 105(a). *See California Fidelity*, 198 B.R. at 574 (monetary sanction imposed for violation of section 1125(b)); *Rook Broadcasting*, 154 B.R. at 976 (same). Where a creditor disobeyed a court order that a competing plan not be sent to creditors, one court found the creditor in civil contempt and sanctioned it accordingly. *See Aspen Limousine*, 198 B.R. at 349–51. The Debtor's Motion for Sanctions seeks similar relief.

Through its Plan Voting Motion, the Debtor also requests that the Court remedy the harm caused by Foresta's and Caliber's actions by disqualifying their votes, pursuant to 11 U.S.C. § 1126(e) on future plans to be submitted by the Debtor. Sec-

tion 1126(e) permits a bankruptcy court to hold invalid any vote that was not made or solicited "in good faith and in compliance with the applicable provisions of this title[.]" 11 U.S.C. § 1125(e). "According to case law, the definition of good faith appears to be 'whether those parties in interest with respect to whom a motion for disqualification is made, had some ulterior reason for their action which looked to some special advantage to be gained thereby.'" *In re Holly Knoll Partnership,* 167 B.R. 381, 385 (Bankr.E.D.Pa.1994) (quoting 5 *Collier on Bankruptcy* ¶ 1126.05[1] at 1126–19 (15th ed.1993)); *see also In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289 (Bankr.W.D.Pa.1990) (If a claim holder is pursuing an interest in addition to its interest as a creditor, bad faith may be found).

■ The remedies suggested by the Debtor are, for one reason or the other, inappropriate. Civil contempt is a remedy which should be used sparingly and should not be employed without more of a direct relationship between a specific order focused on an alleged contemnor and the suggested violation. *See Willy v. Coastal Corp.,* 503 U.S. 131, 139, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992) (civil contempt is designed to force contemnor to comply with direct order of court); *see also, In re Bennett,* 41 B.R. 958, 960 (E.D.Wis.1984) (citing *Gompers v. Buck Stove & Range Co.,* 221 U.S. 418, 451, 31 S.Ct. 492, 55 L.Ed. 797 (1911)) ("The power to punish for contempt, being a drastic sanction, is to be used sparingly and with caution."). Furthermore, the Motion for Sanctions fails to comply with Bankruptcy Rule 9020, which requires, inter alia, that the movant specify whether the alleged action com-

plained of constituted civil or criminal contempt. *See* Fed.R.Bankr.P. 9020(b). And the remedies suggested by the Plan Votion Motion—disqualification of any votes made in the future by Foresta and Caliber and advance disapproval of any plans to be submitted by Foresta and Caliber—are premature and in fact may miss the mark.[10] No plan with an approved disclosure statement is now before the Court, no vote has been cast and no assessment can now be made as to whether vote disqualification would have any impact on confirmation of any plan or, more importantly, ameliorate the harm caused by Foresta and Caliber.

In the end, one truth remains. The secured and other unsecured creditors in this case have been told by Foresta and Caliber that rejection of the Debtor's plan will be followed by Foresta's and Caliber's plan offering prompt payment in full of their claims. Unsecured creditors are unlikely to forget the unapproved plan and disclosure statement mailed to them by Foresta and Caliber, albeit in purportedly draft form. The appropriate remedy therefore ought be designed to undo that harm, above all. It must be designed to make Foresta's and Caliber's offer to creditors no longer material.

■ This Court believes that the best remedy can be found in consideration of 11 U.S.C. § 510(c), and that there is precedent for application of that section of the Bankruptcy Code, *sua sponte.*[11] In the case of *M.H. Gordon & Son, Inc. v. Debtor and Committee of Unsecured Creditors,* 62 B.R. 552, 554 (D.Mass.1986), the district court affirmed the bankruptcy court's decision to employ § 510(c), *sua sponte.* In

---

10. Of course, any such plan filed by Foresta and Caliber would now have substantial obstacles to confirmation, not the least of which would be the task of overcoming the requirements of 11 U.S.C. § 1129(a)(2) and (3).

11. Section 510(c) provides:
(c) [A]fter notice and a hearing, the court may—

(1) under the principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
(2) order that any lien securing such a subordinated claim be transferred to the estate.
11 U.S.C. § 510(c).

that case, the bankruptcy court was presented with evidence of substantial misconduct and inequitable self-dealing by an insider secured creditor. Notwithstanding the failure of any party to raise § 510(c), the bankruptcy court turned to that provision to craft the appropriate remedy, and subordinated the creditor's claim to the claims of other unsecured creditors, *sua sponte*. The district court affirmed noting that the bankruptcy court had the duty, as well as the power, to so act. *M.H. Gordon & Son*, 62 B.R. at 554.

As this Court explained in *Rodolakis v. Chertoff (In re 1236 Development Corp.)*, 188 B.R. 75 (Bankr.D.Mass.1995):

> The seminal case on equitable subordination is *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977) wherein that court established three requirements for the application of the doctrine of equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.[12] *Id.* at 699–700. Most courts follow *Mobile Steel, see e.g., Matter of Herby's Foods, Inc.*, 2 F.3d 128 (5th Cir.1993); *First National Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 974 F.2d 712 (6th Cir. 1992); *In re Vitreous Steel Products Co.*, 911 F.2d 1223 (7th Cir.1990); *Fluharty v. Wood Products, Inc. (In re Daugherty Coal Co. Inc.)*, 144 B.R. 320 (N.D.W.Va.1992), including courts in the First Circuit. *See Capitol Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604 Columbus Avenue Realty Trust)*, 968 F.2d 1332, 1353 (1st Cir.1992); *Boyajian v. DeFusco (In re*

*Giorgio)*, 862 F.2d 933, 938 (1st Cir. 1988); *In re Beverages International Ltd.*, 50 B.R. 273, 281 (Bankr.D.Mass. 1985).

*Rodolakis*, 188 B.R. at 80–81.

The *Mobile Steel* standards are clearly met here. Foresta and Caliber have engaged in grossly inequitable conduct, having violated no less than two sections of the Bankruptcy Code and one of the Bankruptcy Rules, all of which were promulgated by Congress to provide equitable treatment for the debtor and other creditors. Undoubtedly those violations conferred on Foresta and Caliber an unfair advantage—in fact precisely the advantage which those sections of the Bankruptcy Code were designed to preclude. And if the third leg of the Mobile Steel test has survived the repeal of the Bankruptcy Act, it is difficult to conceive how subordination of the Foresta and Caliber debt is anything other than a facilitation of, rather than an inconsistency with, Congress' important goals in fashioning Chapter 11 relief.

█ In view of the foregoing, the Court will subordinate the claims of Foresta and Caliber to the claims of all other creditors (other than any insider claims). Such subordination will assist the Debtor in approving its offer to creditors. That improvement, together with the unlikelihood that Foresta and Caliber will be able to submit a confirmable competing plan (see infra n. 10), is the best remedy which the Court can craft among those available. Finally, the Court will order that Foresta and Caliber reimburse the estate for Debtor's counsel's attorneys fees in drafting and prosecuting the two Motions before the Court.

## V. *Conclusion*

The bankruptcy court is obliged to give the Chapter 11 debtor every reasonable

---

**12.** The third requirement may be moot given that § 510(c) incorporates the common law of equitable subordination into the Bankruptcy Code. *See 80 Nassau Associates v. Crossland Federal Savings Bank (In re 80 Nassau Associ-*

*ates)*, 169 B.R. 832, 841 (Bankr.S.D.N.Y. 1994). *Mobile Steel* was decided prior to the Bankruptcy Reform Act of 1978, which created § 510(c).

opportunity to present and confirm a plan reorganizing its financial affairs. Concomitantly, the Court is obliged to use its best efforts to ensure that, in the course of the debtor's reorganization effort, the rights of creditors are not prejudiced. But, most important, the Court has a duty to safeguard the integrity of the negotiation process which is at the heart of Chapter 11. Foresta and Caliber undermined that process by communicating to creditors information (right or wrong) which interfered with a negotiation between the Debtor and its creditors that Congress intended to be exclusive. The Court's expression of disapproval of that behavior must be unequivocal.

For the reasons set forth above, the Motions are allowed insofar as this Court, *sua sponte*, subordinates the claims of Foresta and Caliber to all other non-insider claims; and will order Foresta and Caliber to pay to Debtor's counsel such attorneys fees as the Court may approve on application by such counsel. The Motions are denied as to the balance of the relief sought.